628 So.2d 130 (1993)
FIRST PAGE OPERATING UNDER THE NAME AND CORPORATE ENTITY, GROOME ENTERPRISES, INC.
v.
NETWORK PAGING CORPORATION, William T. King, Larry Boykin, Keri Marengo, James Battaglia and Dennis Hayes.
No. 93-CA-0030.
Court of Appeal of Louisiana, Fourth Circuit.
November 30, 1993.
*131 Sidney D. Meeks, Alexander M. McIntyre, Jr., Abbott & Meeks, New Orleans, for defendants/appellants.
Henry W. Kinney, III, Suzanne E. Ecuyer, New Orleans, for plaintiff/appellee.
Before CIACCIO and WALTZER, JJ., and JAMES C. GULOTTA, J. Pro. Tem.
WALTZER, Judge.
Defendants/appellants, Network Paging Corporation ("Network"), Larry Boykin, James Battaglia and Dennis Hayes, appeal from a judgment of the Civil District Court for the Parish of Orleans entered upon a jury verdict awarding plaintiff, First Page Operating Under the Name and the Corporate Entity, Groome Enterprises, Inc. (sic) ("Groome") the sum of $125,000 in damages and $41,250 in attorneys' fees; and from that Court's judgment denying defendants' motions for judgment notwithstanding the verdict, new trial or remittitur. The jury found in favor of the remaining defendants, Ray Russenberger and William King.
The individual appellants had been employed by Groome, a provider of radio paging services in the Greater New Orleans area. *132 As a condition of employment, they entered into non-compete contracts furnished by Groome and containing provisions which, inter alia, sought to prohibit certain activities by employees once their employment relationships ended. These activities included engaging in competition with Groome, soliciting Groome's customers and disclosing confidential information. Groome claimed that the individual appellants and William King, also a former Groome employee, left Groome and conspired with Ray Russenberger, Network's President, to commit unfair trade practices by using confidential information to obtain certain of Groome's accounts.
Groome admits that the non-competition agreements are unenforceable, but argues for the enforceability of the provisions against disclosure of confidential information contained in those contracts. Groome contends that the defendants Russenberger, King, Hayes, Boykin and Battaglia violated the Louisiana Unfair Trade Practices and Consumer Protection Act ("Act") (LSA-R.S. 51:1401-1405). Copies of Boykin's and Hayes' non-compete contracts, with the anti-competition language intact, were submitted to the jury, together with testimony (contradicted by Battaglia but apparently accepted by the jury) that Battaglia had executed a contract identical in those provisions which was not available for introduction. Russenberger and King, who had not executed non-competition contracts, were exonerated by the jury, and that finding was not appealed. The only individuals cast in judgment were those who had entered into restrictive contracts with Groome.
In February, 1989, Groome and Network were engaged in competing paging businesses operating in the New Orleans area. Groome employed a sales staff of six to eight during the year, maintained with a turnover of sixty-four salesmen. Network employed four salesmen in its New Orleans office, but provided paging coverage from Galveston and Houston, Texas, to the Florida panhandle, and operated its main office in Pensacola, Florida. On February 15, 1989, William King left his position as Groome's sales manager, and shortly thereafter became a member of Network's sales force. It is at this point that the appellants' activities of which Groome complains begin.

DENNIS HAYES
Dennis Hayes received no specialized training from Groome, nor was he advertised individually as the salesman to be seen for Groome's products. Hayes left Groome's employ on 12 July 1989, following nearly two years as a salesman. There is no evidence of any activity adverse to Groome during that term of employment. There is no evidence that Hayes took any customer lists or lead sheets with him when he left Groome, or that he left with any other information except that contained in his own memory.
Groome alleges that after joining Network's sales force, Hayes solicited Groome client Scianna Ice Company, a Bogalusa firm having one pager. Hayes offered Scianna the wider paging service area provided by Network, and succeeded in signing the firm. No evidence was offered that Hayes had taken from Groome any confidential documents concerning Scianna.
Groome also claims that Hayes improperly brought the Hibernia National Bank account to Network. Viewing the evidence in the light most favorable to Groome, we find no conduct that constitutes an unfair trade practice. While Hayes, on a lead from his mother, who headed the Bank's marketing staff, had called on Hibernia approximately five months before leaving Groome, Hibernia was never signed as a Groome customer; the testimony is uncontroverted that this failure to sign Hibernia resulted from Groome's inability to provide the Bank's required coverage. In brief, Groome alleges Hayes used confidential information in this solicitation, but failed to provide any evidence of such information.
Hayes' solicitation of Groome customer First Federal Savings and Loan likewise does not rise to the status of unfair trade practice, there being no evidence of the use of confidential information or trade secrets in the solicitation or servicing of the account. There, the call was initiated after Hayes began working for Network, and was made through the efforts of Hayes' wife, a First Federal employee, who had heard her boss express interest in pricing pagers.
*133 Viewing the evidence most favorably to plaintiff, the verdict rendered against Hayes is unsupported by evidence of anything more than use of his memory, experience and personal and family contacts to solicit customers for his new employer.

JAMES BATTAGLIA
James Battaglia received no specialized training from Groome, nor was he advertised individually as the salesman to be seen for Groome's products. He was employed by Groome for six months, whereupon he left Groome and within two weeks was hired as a Network salesman. There is no evidence that Battaglia took any customer lists or lead sheets with him when he left Groome, or that he left with any other information except that contained in his own memory.
Perhaps the jury accepted the evidence, contradicted by Battaglia's testimony, that he attempted to remove from Groome's office a stack of papers that could have included sales leads. The evidence is uncontroverted, however, that the attempted removal (if it occurred, and if the stack of papers included confidential information) was unsuccessful. Groome's office personnel testified without exception that the customer list, the only information Groome designated as confidential, remained under Groome's control, under lock and key, and was not removed from Groome's office by any of the appellants.
Battaglia was also accused of having deceived a Groome customer, Business Sound, into believing that it was still doing business with Groome when, in fact, the business had been moved to Network. The evidence is uncontroverted that Battaglia, while employed by Groome, received a service complaint from Business Sound's agent, Ms. Ulicini-Adams. After moving to Network, Battaglia presented Ms. Ulicini-Adams a new contract naming Network as Business Sound's service company, and another Network employee gave her five new pagers bearing the Network logo and removed Ulicini-Adams' five pagers bearing Groome's logo. For five months, Ms. Ulicini-Adams received bills for service from Network, made out checks payable to Network, and mailed the checks to Network's office in Pensacola. No reasonable person could conclude that Battaglia deceived the customer or withheld from her the identity of the paging service company he represented and with whom she was doing business for five months. We are not presented here with a credibility issue, or with conflicting facts. It is the conclusion drawn from the uncontroverted facts that we find to be manifestly erroneous/clearly wrong. Canter V. Koehring Co., 283 So.2d 716, 724 (La.1973)
There was testimony by Groome's former employee JoAnn Thane that Battaglia told her of a fee splitting arrangement between Hayes and Battaglia during the time Hayes was employed by Network and Battaglia by Groome. Such an arrangement is on its face unreasonable. No explanation was offered to explain why Battaglia, who by all accounts was not successful while at Network, would give up a part of his own compensation to Hayes. If such an arrangement did exist, it could have operated only from 12 July 1989 (when Hayes left Groome) until 14 August 1989 (when Battaglia left Groome). Groome had adequate opportunity under Louisiana's liberal discovery procedures to determine the identity of any customers "pirated" during that very limited time period. Groome offered no evidence to support such a loss. This allegation fails for lack of any proof of damage.

LARRY BOYKIN
Larry Boykin received no specialized training from Groome, nor was he advertised individually as the salesman to be seen for Groome's products. Groome employed Boykin for twenty-two months as a messenger and as a computer operator. There is no evidence that Boykin took any customer lists or lead sheets with him when he left Groome, or that he left with any other information except that contained in his own memory.
Accepting Groome's evidence as true, Boykin had access only to the names and payment records of Groome's customers. While Groome argued that this gave Boykin access to confidential pricing information, the record shows that in this highly competitive industry, the price charged by the various providers is readily available over the telephone. It would be a perfectly normal negotiating *134 tactic for a customer to disclose his current cost to a competing provider in the hope that the competitor could better the price. There is no legal or contractual impediment to Groome's customers' disclosing his prices or to the competitors' asking the customers for this information. The record is clear that, as is common in the electronic technology industry, price changes occur frequently. Because price information becomes quickly obsolete, its utility is ephemeral and its value, therefore, minimal. Given such a fluid, highly competitive pricing system, it is patently unreasonable to consider price information to be confidential. There is no evidence that Boykin took with him any of Groome's customer records, lists, or equipment when he left Groome, or that he destroyed documents or computer products. There is absolutely no evidence that Boykin did any work for Network while he was still employed by Groome.

NETWORK PAGING CORPORATION
The corporate defendant has been cast in judgment as well, its vicarious liability arising out of misconduct by Network's officers or agents. The jury in its unappealed verdict exonerating Network's president from liability expressed its opinion, in which we concur, that Groome failed to demonstrate Russenberger's conspiracy to enrich himself by "padding" the value of the Network business which he eventually sold. The desire to maximize investment by diligence and enterprise is not, absent wrongful actions in furtherance thereof, an actionable violation of the Act. The jury found Russenberger's actions to be proper, and since Groome did not appeal that verdict, we will not disturb that finding.
Similarly, the jury's exoneration of William King eliminates his activities as a basis for Network's vicarious liability. Viewing the evidence presented to it, the jury found that King's solicitations of Vetco Gray, Cash Register Sales, Axelson, Inc. and First Capital Life were within the bounds of fairness.
The jury's imposition of liability on the corporate defendant, then, must have been based on the activities of the remaining appellants. The record is simply devoid of any conduct on their part before or after their hiring by Network that could be considered an unfair trade practice. There is therefore no evidentiary basis for a finding of Network's vicarious liability.

APPLICABLE LAW: Agreements not to compete
There is no doubt that these anti-competition contractual provisions are unenforceable against the individual appellants. At the time these contracts were executed, La.R.S. 23:921 limited the effect of such provisions to cases in which the employer provided the employee costly, specialized training, or individually promoted the employee through its marketing program as the salesman to be seen for purchase of the employer's product. Groome introduced no evidence probative of this sort of training or promotion. The public policy was set forth by the Louisiana Supreme Court in Orkin Exterminating Company v. Foti, 302 So.2d 593 (La.1974). In Orkin, Justice Tate reviewed the background of the public policy requiring great restraint in the imposition of contractual limitations that "may effectively prevent an employee from leaving his present employment in order to earn a better living in the occupation in which experienced and in the area of his livelihood." (Id. at 597).
The overwhelming importance of open employment opportunity and job mobility is a time-honored principle deeply rooted in our jurisprudence, enshrined in such landmark cases as Pitcher v. United Oil and Gas Syndicate, 174 La. 66; 139 So. 760 (1932), wherein the Supreme Court held:
An employee is never presumed to engage his services permanently, thereby cutting himself off from all chances of improving his condition; indeed, in this land of opportunity it would be against public policy and the spirit of our institutions that any man should thus handicap himself; and the law will presume almost juris et de jure that he did not so intend. And if the contract of employment be not binding on the employee for the whole term of such employment, then it cannot be binding upon the *135 employer; there would be lack of "mutuality."[1]
This lack of mutuality is evident in Groome's "employment contracts"[2] with these defendants. An excellent discussion of the Civil Code considerations involved in this context is found in Mix v. University of New Orleans, 609 So.2d 958, 961 (La.App. 4th Cir.1992), wherein the Court discusses the doctrine of mutuality:

Gilbert v. Tulane University, 909 F.2d 124, 126 (5 Cir.1990) provides an excellent synopsis of the legal basis for the doctrine:
Under Louisiana law, a person employed for an indefinite period is an employee at will. Brannan v. Wyeth Laboratories, Inc., 526 So.2d 1101, 1103-04 (La.1988); see LA.CIV.CODE ANN. art. 1778 (West 1987). An at-will employee is free to quit at any time without liability to his or her employer and may be terminated at any time, provided the termination does not violate any statutory or constitutional provision. LA.CIV.CODE ANN. art. 2747 (West 1952); Johnson v. Delchamps, 897 F.2d 808, 810 (5 Cir. 1990).
In light of the codal requirement of mutuality and Louisiana's strong public policy against restraint of competition, Louisiana does not favor efforts by an employer who seeks to limit his former employee's competitive options.[3]
Restriction on employment mobility can operate to create a class of little more than indentured servants, whose livelihoods and economic futures are proscribed by the narrow confines of their employers' prerogatives. It thus becomes the duty of this Court to protect the worker's economic freedom, without which personal freedoms are empty promises. To require a worker trained in his particular field to leave his experience, memory and knowledge at the door of his former employer makes any change of employment difficult, if not impossible. The threat of costly, lengthy litigation instituted by a former employer armed with a restrictive contract and greater resources exerts a chilling effect on the employee as he considers his career options. The inequality of bargaining position arising out of the compelling need for employment (see, Wolf v. Louisiana State Racing Commission, 545 So.2d 976, 980 (La. 1989)) that led the employee to accept the proffered restrictive contract in the first place operates to exacerbate its restrictive effect when the employee begins to consider making a career change. It is disingenuous to contend that employees need no public policy protection in this field because they are free to negotiate these contracts on whatever terms they choose. Boykin's testimony at trial is a particularly poignant example:
"Sir, when I'm threatened with my livelihood, I'm not sure that anybody thinks clear if you're in that situation.... We weren't spoken to in terms of we were *136 supposed to understand it, we were supposed to sign it."
Groome has not offered proof of any specialized training, or marketing tailored to the promotion of the individual defendants. Indeed, Groome's actions below and in brief on appeal reflect its understanding that a claim for breach of an agreement not to compete, given the circumstances of the instant case, will not lie.

APPLICABLE LAW: Unfair Trade Practices
The employment contracts clearly demonstrate Groome's intention at all times to impose the greatest possible restriction on these employees should they venture to improve their positions by seeking new employment opportunities. Having failed to bring itself within the standard set by the legislature and illuminated by the Louisiana Supreme Court to justify enforcement of these heavily disfavored non-competition agreements, Groome now urges in effect the same claim by seeking to enforce the "non-disclosure" provision (as distinguished from the "non-compete" provision) under the Louisiana Unfair Trade Practices and Consumer Protection Act ("Act") (LSA-R.S. 51:1401, 1405).
The Act provides:
A. Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful. LSA-R.S. 51:1405(A)
Groome alleged but failed to prove a conspiracy among Network, the exonerated defendants Russenberger and King, and the individual appellants to violate the Act.
This Court will not allow Groome to gain indirectly that which the public policy of the state denies him directly unless clearly and unequivocally mandated by the Act. As the United States Court of Appeal for the Fifth Circuit held, in reviewing a recent case under the Act:
Even though [the Act] is broadly written, it cannot apply to activity which is not actionable under Louisiana law. American Waste & Pollution Control Co. v. Browning-Ferris, Inc., 949 F.2d 1384, 1392 (5 Cir.1992).
In National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269 (La.App. 4th Cir. 1980), the court held:
What constitutes unfair competition is a matter to be decided in each individual case and involves a balancing between the right of the employee to individual freedom on the one hand and the right of the employer to honest and fair competition and to the protection of business assets and property in the nature of trade secrets on the other hand.... A former employee who enters business in competition with his former employer necessarily utilizes the experience he acquired and the skills he developed while in his former employment.... Considerations as to the type of protection to be afforded to the employer in a specific case include the manner in which and the purpose for which customer lists are compiled; the conduct and motivation of the employee before and after termination of the employment; the manner in which the customers are contacted after the termination and the nature of the representations made to the customer by the former employee; and the existence of a scheme to take over all or a substantial part of the former employer's business, or of an intent to injure the former employer's business." (Emphasis added.) Id. at 1273.
The employees' actions upon which the National Oil Service court predicated recovery included copying and destroying plaintiff's customer contracts, taking the plaintiff's written route lists of customers, destroying plaintiff's customer records, stealing its equipment, neglecting customer service while still employed by plaintiff, telling customers that plaintiff was going out of business, processing oil that had been obtained for plaintiff's account and retaining plaintiff's funds for defendants' own use (resulting in their arrest on criminal charges). The court found that the issue was basic business honesty, not personal freedom to engage in open, fair competition. The court held further:
While perhaps no single factor would alone be considered unfair competition, the evidence *137 (viewed in a light most favorable to the prevailing party) established a course of calculated misconduct over a considerable period of time." 381 So.2d at 1274.
Even under the egregious circumstances of the National Oil Service case, the Court refused to allow plaintiff injunctive relief to prohibit the defendants from operating their business, soliciting plaintiff's customers, making defamatory and derogatory statements to other persons about the integrity of plaintiff and its president, employees and agents or enticing and hiring away plaintiff's employees. This case demonstrates clearly the supervening significance of Louisiana's public policy protecting the right to compete.
Solicitation of customers after the end of the employment relationship likewise does not form the basis for a cause of action for unfair competition. Ahmed v. Bogalusa Kidney Care Center, 560 So.2d 485 (La.App. 1st Cir., writ den. 564 So.2d 324 (La.1990). In Ahmed, the court considered a claim against employees who sought to operate their own kidney dialysis center after having left their former employer. Plaintiff claimed that defendants enticed a doctor, staff and patients of the employer center to leave for the new center. The trial judge granted defendants' motion for a directed verdict and the appellate court affirmed the trial court's findings that the defendants' activities did not "offend public morals." Plaintiff failed to prove that the defendants took actual, physical records or equipment to build up their business. The court held that conduct is unlawful within the meaning of the Act when it "offends established public policy and when the practice is unethical, oppressive, unscrupulous, or substantially injurious to consumers and consumers include business competitors." (citing Roustabouts, Inc. v. Hamer, 447 So.2d 543, 548 (La.App. 1st Cir.1984)).
In addressing the solicitation issue in National Oil Service, the court held:
Previous decisions have allowed former employees in soliciting customers to rely on their memory and on the general information they acquired while they were employed by the plaintiff. (citing cases) ... While the trial court perhaps could have granted limited relief ... such as prohibiting use of written lists and documents taken from plaintiff, discussion of such relief at this point in time would be academic." 381 So.2d at 1274.
Groome presented no evidence of purloined written lists or documents to support even such a limited infringement on the basic right to compete. While one of plaintiff's former employees testified that she foiled what she characterized as his attempt to leave the Groome office with unspecified papers, as to which there was suggestion but no proof of confidentiality, the evidence is uncontroverted that this alleged attempt failed. In fact, Groome's employees testified consistently that the customer list, identified by Groome as the company's most valuable asset and the only document he specifically referred to as confidential, remained at all times under lock and key in Groome's office.
It does not require an advanced business degree or expensive specialized training to determine what businesses in our community would be candidates for paging services. Groome has neither proprietary nor confidential interest in the fact that hospitals, clinics, financial institutions, service companies and firms engaged in offshore activities are likely prospects for paging services. Groome's interest in such information is far outweighed by the public policy to protect workers' job mobility. Potvin v. Wright's Sound Gallery, Inc., 568 So.2d 623, 628 (La. App. 2nd Cir.1990)
Groome submitted no evidence that his employees were solicited by Network or its employees. The record shows without contradiction that the Groome office did not enjoy the best employer-employee relations. The turnover of sixty-four salesmen during a year to maintain a sales staff of six to eight is but one example. Hayes testified to a changing commission schedule that demoralized salesmen. He also testified to Groome's practice in referring customers' add-on pagers to office staff, depriving salesmen of commissions on these added products. Hayes' experience on leaving Groome contributed further to the low office morale, and was cited by Battaglia as a reason for his leaving *138 Groome on the first day after his final payday:
(Hayes): I was having a hard time getting my paychecks and I had to go to the Labor Board to get my checks from Mr. Groome.... (H)e has tore up my payroll check and told me that if I wanted to get paid, I had to go to the Labor Board.
The only evidence adduced at trial on this issue shows that low morale at Groome and Network's broader-based product and better working conditions, rather than unfair trade practices, led some of Groome's employees to seek their fortunes with Network.
On the legal issue of hiring away co-employees, the National Oil Service court held:
... [P]arties who are associated in a business or enterprise may agree that upon termination they will not hire the employees of the former joint business or enterprise.... In the absence of such a contract, however, no basis generally exists for an injunction against the exercise of the basic freedom of association which is inherent in the hiring of employees and the taking of a job with an employer. 381 So.2d at 1274, 1275.
Thus, there is no factual or legal basis for a finding that defendants improperly hired Groome's employees in violation of the Act.
What constitutes unfair trade practices is left to the courts. Gautreau v. Southern Milk Sales, Inc., 509 So.2d 495, 497 (La.App. 3rd Cir.1987); Dufau v. Creole Engineering, Inc. 465 So.2d 752 (La.App. 5th Cir.1985), writ denied, 468 So.2d 1207 (La. 1985). Groome's claims do not rise to the level of contra bonos mores set forth in the statute and elucidated in the National Oil Service case.
The authorities cited by Groome are consistent with the decision of this Court. In Roustabouts, Inc. v. Hamer, 447 So.2d 543 (La.App. 1st Cir.1984), defendants were stockholders, directors, officers or employees of the plaintiff, a corporation engaged in the business of hiring roustabout personnel used on land and offshore in the Gulf of Mexico. While so employed, defendants engaged in a conspiracy involving use of plaintiff's personnel and equipment on behalf of their competing enterprise; use of plaintiff's equipment directly by the enterprise without plaintiff's knowledge, and use of plaintiff's insurance to cover the enterprise's workers, all with specific intent not merely to compete successfully and "grow" a new business, but to injure the business of which defendants were still officers, directors, shareholders and employees.
In Engineered Mechanical Services v. Langlois, 464 So.2d 329 (La.App. 1st Cir. 1985), writ den. 467 So.2d 531, there was no contractual restriction on disclosure of confidential information. The defendant was employed in plaintiff's engineering operation running its machine shop. This case turned on industrial espionage involving four highly technical trade secrets developed by plaintiff's engineers. Absent any evidence that customer lists or confidential material of any other sort were taken from Groome by any means other than the experience and memory of the former employees, Langlois does not support the judgment rendered below.[4]
*139 We find that the plaintiff failed to meet its burden of proof of violation of the Louisiana Unfair Trade Practices and Consumer Protection Law. There being no factual basis for a finding of liability on the part of the defendants, we find the jury verdict below awarding Groome damages in the amount of $125,000 and attorneys' fees in the amount of $41,250 to be manifestly erroneous and clearly wrong.[5] (Canter v. Koehring Co., 283 So.2d 716 (La.1973); Rosell v. ESCO 549 So.2d 840 (La.1989).
As a matter of law, the actions complained of do not constitute violation of the Act, and, thus, there is no legal basis for awarding Groome damages and attorneys' fees.
For the foregoing reasons, that portion of the Judgment rendered against defendants Network Paging Corporation, Larry Boykin, James Battaglia and Dennis Hayes is REVERSED. Those portions of the judgment dismissing plaintiff's claims against Ray Russenberger and William King are AFFIRMED.
REVERSED IN PART. AFFIRMED IN PART.
CIACCIO, J., concurs with reasons.
CIACCIO, Judge, concurring.
I concur in the result.
At the time these employment contracts were executed, La.R.S. 23:921 provided in part as follows:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court ...
(Emphasis ours.)
As the non-competition agreements in this case were null and unenforceable, the non-disclosure provisions contained in these agreements were likewise null and unenforceable. Accordingly, the non-disclosure provisions of the contract may not be used for any purpose. Thus, it was error for the court to allow the jury to consider the contract as a basis for a finding of an unfair trade practice.
NOTES
[1] What courts call "mutuality" is really better understood as simple fairness. If this Court is expected to enforce the employer's right to fire his employee at will, then we must be no less zealous in enforcing the employee's right to leave at will, and engage in work he is qualified to perform by reason of education and experience.
[2] In argument, Groome refers to these agreements euphemistically as "employment contracts," giving rise to the inference that there are provisions running in favor of the employee, such as guaranteed term of employment or contractual commission policy. Such terms are absent in the agreements. Simply stated, these are non-compete agreements, not employment contracts.
[3] This public policy against anti-competition agreements was retained in subsequent statutory amendments. LSA R.S. 23:921(A) now provides:

Every contract or agreement, or provision thereof, by which anyone is restrained from exercising a lawful profession, trade, or business of any kind, except as provided in this Section, shall be null and void.
The statutory exceptions to this general policy contained in the succeeding paragraphs of the statute are tightly drawn and should be narrowly construed in keeping with the underlying policy prohibiting restraint of free competition. Water Processing Technologies, Inc. v. Ridgeway, 618 So.2d 533, 536 (La.App. 4th Cir.1993); Medivision v. Germer, 617 So.2d 69 (La.App. 4th Cir. 1993), writ den. 619 So.2d 549 (La.1993). Laws in derogation of established rights of long-standing are to be strictly construed. Touchard v. Williams, 617 So.2d 885 (La.1993).
[4] The apparent incongruity in the jury's actions in exonerating King and Russenberger while holding the contracting parties and the corporate defendant liable presents a puzzling issue. Counsel for appellants in oral argument characterized this anomaly as the jury's having exonerated the generals while hanging the foot soldiers. We begin with the findings that are accepted by all parties: that is, that the actions of Russenberger and King do not constitute a violation of the Unfair Trade Practices Act. Having made that determination, on what could the jury have based its findings of liability against the contractually bound employees? Groome alleged that King was out soliciting Groome's former customers, competing with Groome and enticing Groome's employees to come to work with him long before Battaglia, Boykin and Hayes heeded the siren's call of greater opportunity with Network. Groome contends Russenberger was the mastermind of this sinister conspiracy to inflate Network's value. But the jury found Russenberger and King did nothing sufficiently unethical to constitute a violation of the Act. What is left? What did Boykin, Battaglia and Hayes do that Russenberger and King (who had far greater economic interest in the enterprise) did not? Simply stated, those defendants who signed restrictive contracts (and, vicariously, their employer) were cast in judgment; those who did not were not. The irresistible conclusion is that the jury, despite the trial court's cautionary instructions, viewed the employment contracts' anti-competition provisions as somehow sacrosanct, and imposed liability on the defendants, whether consciously or not, based upon the breach of contract theory abandoned by Groome.
[5] As we have granted the appellants the relief they seek it is unnecessary to address their contention that it was error for the trial court to deny their motions for a judgment notwithstanding the verdict, for a new trial and for a remittitur.