666 So.2d 1338 (1996)
The UNITED GROUP OF NATIONAL PAPER DISTRIBUTORS, INC., Bancroft Paper Company, Inc., and F. Speed Bancroft, Plaintiffs-Appellees,
v.
Carol Susan Gilley VINSON, Gale R. Hodge, Steven M. Goodman, Joel Kaplowitz, Frank D. Hamrick, Murray L. Florence, Jr., Lambert R. Dralle, David M. Muhlendorf, W.C. Parks, Jr., and Consolidated Distributors, Inc., Defendants-Appellants.
No. 27739-CA.
Court of Appeal of Louisiana, Second Circuit.
January 25, 1996.
Rehearing Denied February 22, 1996.
*1341 William D. Brown, Kneipp & Hastings by Donald L. Kneipp, Monroe, for Defendants-Appellants, Vinson, Hodge, Kaplowitz, Hamrick, Dralle & CDI.
Liskow & Lewis, by Joe B. Norman, New Orleans, for Defendant-Appellant, Florence.
Frilot, Partridge, Kohnke & Clements L.C. by James H. Brown, Jr., New Orleans, for Defendant-Appellant, Parks.
Theus, Grisham, Davis & Leigh by Paul D. Spillers, Monroe, for Plaintiffs-Appellees.
Before SEXTON, BROWN and WILLIAMS, JJ.
BROWN, Judge.
Following a lengthy trial, a jury found that defendants-appellants misappropriated trade secrets, breached duties owed and violated the Louisiana Unfair Trade Practices Act. The jury awarded $9,500,000 in damages to plaintiffs, The United Group of National Paper Distributors, Inc., and Bancroft Paper Company. Defendants-appellants filed motions for judgment notwithstanding the verdict, new trial and/or remittitur. This appeal follows the trial court's denial of those motions. We reverse and render judgment in favor of defendants.

FACTUAL BACKGROUND
The United Group of National Paper Distributors, Inc. ("United Group"), a Louisiana corporation, was formed in 1983 by Bancroft Paper Company. As a buying group/purchasing cooperative, it is made up of small independent paper distribution companies. By pooling the purchasing power of its members, United Group is able to negotiate and obtain significant discounts or commissions from large paper manufacturers and suppliers. A portion of the discounts go to United Group and the remainder is rebated to the member companies that made the purchases. In 1989, United Group's profits exceeded $700,000. Members could terminate their affiliation with United Group without reason upon giving thirty days' notice.
Bancroft Paper Company ("Bancroft Paper") owned 91% of United Group stock and participated as a member of the buying cooperative. F. Speed Bancroft ("Bancroft") is Bancroft Paper's sole shareholder. The remaining 9% of United Group's stock was owned by defendant, Susan Vinson, who became president of the buying group in 1987. At all relevant times, the only other officers/employees of United Group were Jay Marcel, marketing manager, and Gale Hodge, who served as administrative coordinator and corporate secretary.
Initially, the fiduciary board of directors included people who either owned or were employed by participating member companies of the buying group; however, on December 3, 1986, the structure of United Group was altered by shareholder resolution. The new fiduciary board had only two members, Bancroft and Ms. Vinson. An advisory board of directors was created to represent the interests of United Group's participating members. According to the shareholder resolution, the corporate structure was changed to avoid potential conflicts of interest and legal exposure of the member companies, *1342 whose employees and owners served as directors of the buying group.
The primary function of the advisory board of directors was to represent membership concerns and views. The advisory board did not set policy, could not hire or fire employees, nor could it take action regarding United Group's finances. The advisory board members served solely at the pleasure of the corporation and could be removed at any time. The advisory board had no right to information pertaining to the management or operation of United Group. The only thing the advisory board could do was make recommendations, which could be implemented, rejected or ignored. Members serving on the advisory board were paid $500 per meeting plus expenses.
At a meeting of the advisory board in October 1989 in Dallas, Texas, Bancroft proposed to sell 50% of United Group's stock to the membership for $12,000,000. Also at this meeting, Bancroft introduced to the advisory board Hans Roth, chairman of Muhlebach/Holzstoff Holdings-A.G., a Swiss corporation, and expressed the foreign corporation's interest in acquiring paper companies in the United States and in forming a marketing cooperative comparable to United Group.
The advisory directors met in Dallas in December 1989 to discuss Bancroft's proposal. Bancroft did not attend this meeting. Following their meeting, the advisory directors presented a counteroffer on behalf of the membership to purchase United Group for $500,000. Bancroft did not respond to this counteroffer.
On March 2, 1990, the advisory directors met with Bancroft, who announced that the Swiss corporation had made an offer to purchase 40% of United Group stock, with an option for the purchase of an additional 20% within two years. The deal was to be consummated at the annual conference for members and suppliers to be held one week later, March 8-10, 1990, in Hilton Head, South Carolina. The advisory directors met with representatives of the Swiss corporation on the first day of the conference to discuss the sale; however, the general membership of United Group was first informed of the pending sale by Susan Vinson at a breakfast meeting on March 9, 1990. Many of the members were visibly upset upon learning of the proposed sale.[1]
After the breakfast meeting, members representing 50-80% of United Group's revenues and the advisory directors met with Bancroft, his attorney, Paul Spillers, and representatives of the Swiss corporation. Recognizing that United Group's value was tied to its member companies and noting the strong opposition from that membership, the Swiss withdrew their offer. The following day, March 10, 1990, Spillers made a presentation on behalf of Bancroft Paper and offered to sell its stock in United Group to the membership. A counteroffer was rejected and, at an impasse, the conference adjourned.
At trial, Bancroft testified that following the Hilton Head conference, he realized that several of the buying group's members were upset and that they were considering forming a competitive group. According to Bancroft, he immediately began preparations for the replacement of the members he expected to lose as a result of the Hilton Head debacle. Bancroft admitted that these members represented the backbone of the buying group.
Even before Hilton Head, Bancroft's relationship with Susan Vinson, United Group's president, was strained. Immediately after the Hilton Head conference, Bancroft asked his attorney, Paul Spillers, how much it would cost if he fired Ms. Vinson, who owned 9% of the company's stock. Ms. Vinson believed *1343 that Bancroft blamed her for Hilton Head and that her future with United Group was tenuous.
Further negotiations between Bancroft and the membership regarding United Group stock continued, with an offer on March 13, 1990, by the membership to buy Bancroft Paper's stock for $1,300,000. Bancroft did not respond. On March 26, 1990, a number of member companies notified Bancroft by letter that they were meeting to discuss their options. Through its attorney, Paul Spillers, Bancroft Paper responded by letter dated April 5, 1990.
Spillers' letter threatened legal action and seemed to be the "straw that broke the camel's back." Following a meeting in Atlanta, Georgia, in April 1990, several member companies, including those with advisory directors, decided to leave United Group and form a new purchasing cooperative. Consolidated Distributors, Inc. ("CDI"), was incorporated on May 8, 1990, and funded in June 1990. United Group's president, Susan Vinson, and marketing manager, Jay Marcel, resigned and went to work for CDI on May 15, 1990. Gale Hodge, administrative coordinator and secretary, resigned from United Group and went to work in that capacity for CDI on June 6, 1990.

PROCEDURAL HISTORY
On March 11, 1991, United Group, Bancroft Paper and F. Speed Bancroft filed suit against: (1) Stephen M. Goodman, Joel Kaplowitz, Frank D. Hamrick, Murray L. Florence, Jr., Lambert R. Dralle, David M. Muhlendorf, and W.C. Parks, Jr., former members of United Group's board of directors; (2) Susan Vinson and Gale Hodge, former United Group corporate employees; and (3) CDI, the newly formed buying group.
Plaintiffs alleged that in March 1990, the individual defendants tortiously interfered with a contract for the sale of United Group stock to the Swiss corporation. According to the petition, after deliberately upsetting the sale, defendants embarked upon a plan to compete with United Group, which included forming CDI, a competitive company; misappropriating trade secrets; hiring away key executive employees; and causing members and suppliers to terminate their contracts with United Group.[2]
Before trial, all claims brought by Bancroft individually were dismissed. Following the presentation of their case, plaintiffs dismissed their claim for tortious interference. Advisory director Muhlendorf was dismissed on a motion for directed verdict. On May 29, 1994, the jury returned a verdict against the remaining defendants. The jury found that the defendants misappropriated trade secrets, breached duties to United Group and violated the Louisiana Unfair Trade Practices Act. The jury awarded plaintiffs damages in the amount of $9,500,000. Judgment in accordance with the jury verdict was rendered on July 11, 1994. Defendants thereafter filed motions for JNOV, new trial and/or remittitur. On January 19, 1995, these motions were denied except that Goodman, an advisory director, was granted a new trial.[3]

APPLICABLE LEGAL PRINCIPLES

Motions for J.N.O.V., New Trial and Remittitur
LSA-C.C.P. Art. 1811 sets forth the rules governing a motion for judgment notwithstanding the verdict (J.N.O.V.). The J.N.O.V. questions whether the jury verdict, as a matter of law, is supported by any legitimate or substantial evidence. To find that the evidence was insufficient as a matter of law requires that there be no valid line of reasoning or permissible inferences which could lead rational men and women to the *1344 conclusion reached by the jury. Gibson v. Bossier City General Hospital, 594 So.2d 1332 (La.App. 2d Cir.1991).
In applying this standard, the trial court may not substitute its judgment of the facts for that of the jury and must consider all the evidence in the light most favorable to upholding the jury verdict. The jury verdict must be given the benefit of every legitimate and reasonable inference that could have been drawn from the evidence. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991); Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986); Gibson, supra.
Because the grant of a new trial does not end the litigation, it is less stringent. Whether to grant a new trial requires a discretionary balancing of many factors. Where the motion for new trial is urged because the jury's verdict is contrary to the law and the evidence, the jury's verdict should not be set aside if it is supportable by any fair interpretation of the evidence. LSA-C.C.P. Art. 1972; Gibson, supra; Willis v. Louisiana Power & Light Company, 524 So.2d 42 (La.App. 2d Cir.1988), writ denied, 525 So.2d 1059 (La.1988).
A J.N.O.V. is required when there is no bona fide factual issue, while it is the existence of a factual issue which justifies the granting of a new trial rather than a directed verdict. Gibson, supra. In reviewing the trial court's determination regarding whether to grant a J.N.O.V. or new trial, the appellate court's review is limited to whether the trial court committed manifest error in its denial of the motions. Id.
LSA-C.C.P. Art. 1814 provides for remittitur as an alternative to a new trial when the trial court determines that the jury's verdict is excessive. Remittitur is appropriate when the sole basis for new trial is an excessive damage award.

DISCUSSION
Defendants-appellants in this case fall into three categories; first, Joel Kaplowitz, Frank Hamrick, Lambert Dralle, Murray Florence and W.C. Parks, former advisory directors of United Group; second, Susan Vinson and Gale Hodge, former employees of United Group; and third, CDI, the competitive buying group.
The jury found that all of the defendants misappropriated trade secrets, violated the Louisiana Unfair Trade Practices Act and breached duties owed to plaintiffs. We will address the trade secrets claim first.

Misappropriation of Trade Secrets
A trade secret is defined by the Uniform Trade Secrets Act, LSA-R.S. 51:1431, et seq., as:
information, including a formula, pattern, compilation, program, device, method, technique or process that derives independent economic value, actual or potential, from not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use, and is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
LSA-R.S. 51:1431(4).
In this case, the burden was on plaintiffs to show that United Group had a legally protectable secret which was misappropriated by defendants in violation of a confidential relationship. Engineered Mechanical Services, Inc. v. Langlois, 464 So.2d 329 (La.App. 1st Cir.1984), writ denied, 467 So.2d 531 (La.1985). Whether something constitutes a trade secret is a question of fact. Wyatt v. PO2, Inc., 26,675 (La.App.2d Cir. 3/1/95), 651 So.2d 359, writ denied, 95-0822 (La.5/5/95), 654 So.2d 331; Engineered Mechanical Services, Inc., supra.
The threshold inquiry is whether any legally protectable information exists. A trade secret is information that has independent economic value because it is not generally known or readily ascertainable and efforts are taken to maintain the information's secrecy. Wyatt, supra.
*1345 Misappropriation of information can also form the basis for a claim under the Unfair Trade Practices Law, LSA-R.S. 51:1401, et seq. The factfinder must balance the right to compete in a free enterprise system against the right to protect business assets and property in the nature of trade secrets. Wyatt, supra, citing National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269 (La.App. 4th Cir.1980).
In the instant case, the jury found that United Group's membership and supplier lists, policies and procedures and "other information" constituted trade secrets. The "other information" alleged to be confidential was supplier contracts, membership agreements and a Dunn & Bradstreet report profiling prospective members.
At trial, Tobie McKown, the current president of United Group, established that the membership and supplier lists were not confidential. At all relevant times, McKown, while soliciting new members, often left with them a list of current members and suppliers, as well as blank membership forms.
Jay Marcel left United Group with Ms. Vinson to work for CDI. Marcel, who returned to United Group as its vice president of marketing in October 1993, testified for plaintiffs at trial. Marcel stated that in 1989 he compiled a comprehensive membership directory for United Group which contained addresses, telephone and fax numbers of all members. This directory was readily available to the members and suppliers.
Shortly before Marcel left United Group, he copied contracts of preferred suppliers and a large Dunn & Bradstreet report profiling prospective members. According to Marcel, this was done at Ms. Vinson's request and the documents were thereafter available for his use at CDI. Ms. Vinson vehemently denied knowledge of or involvement in Marcel's copying of these documents.
Marcel testified that United Group's preferred supplier contracts were highly specialized because they were drafted by the individual suppliers. Marcel, however, admitted that the only significant difference in each contract was the percentage discount offered by the particular supplier and that this information was distributed to all of United Group's members.
Marcel conceded that anyone could order a copy of the Dunn & Bradstreet report. In fact, he ordered such a report for CDI in July 1990.
Plaintiffs also contended that the misappropriation included unspecified financial information. At the Hilton Head conference, Bancroft's attorney, Paul Spillers, made a flip-chart proposal to sell United Group to the membership after withdrawal of the Swiss corporation's offer. Spillers' presentation necessarily included financial information. No efforts were taken to protect this information's confidentiality. The nature of the presentation, an offer to sell United Group to the membership, belies an intent to keep this information secret.
The information which allegedly constituted trade secrets was disseminated and available to the membership and, in some instances, to prospective members. Plaintiffs presented no evidence that any precautions were taken to safeguard any of the information's secrecy. The jury erred in finding otherwise. This readily ascertainable information does not rise to the level of a "trade secret".

Unfair Trade Practices
The Louisiana Unfair Trade Practices and Consumer Protection Law is set forth in LSA-R.S. 51:1401, et seq. It declares unfair methods of competition, as well as unfair or deceptive acts or practices in the conduct of any trade or commerce, to be unlawful. An act is not required to be both unfair and deceptive. What constitutes unfair and/or deceptive practices is not specifically defined, but is determined on a case by case basis. Wyatt, supra.
The Unfair Trade Practices Law does not prohibit sound business practices, *1346 the exercise of permissible business judgment or appropriate free enterprise transactions. To be unfair, the conduct must offend established public policy. Fraud, deceit and misrepresentation constitute deceptive practices. Monroe Medical Clinic, Inc. v. Hospital Corporation of America, 522 So.2d 1362 (La.App. 2d Cir.1988). A defendant's motivation is a critical factor; the actions must have been taken with the specific purpose of harming the competition. Monroe Medical Clinic, Inc. v. Hospital Corporation of America, 622 So.2d 760 (La.App. 2d Cir.1993).
The jury found that defendants' association with CDI was with the intent to harm United Group and that their association with CDI was a violation of the Louisiana Unfair Trade Practices Law. The jury further found that all of the defendants breached duties owed to plaintiffs.

I. ADVISORY DIRECTORS
Initially, United Group's fiduciary board of directors included owners, officers and employees of member companies. In 1985, with the exception of Bancroft, these directors were removed from the fiduciary board to avoid a conflict between their duties to their individual paper companies and their duties as directors of United Group. They were then appointed to an advisory board.
The advisory directors' limited role was set forth in a January 21, 1989, letter from Paul Spillers, Bancroft's attorney, to Ms. Vinson. According to Spillers, the advisory directors were to serve at the pleasure of the corporation and management, could give only non-binding advice and had no right to any information pertaining to the management or operation of the corporation.
Defendants Dralle and Kaplowitz testified that they understood the limited nature of their powers and duties as advisory directors. Jay Marcel stated that the advisory directors represented the members, not United Group. Bancroft also acknowledged that representation of the membership was the primary function of the advisory directors.
At trial, Dr. Dwight Vines, an expert in business management, testified as to the general duties of advisory directors. According to Dr. Vines, "an advisory director has a very limited responsibility to an organization depending somewhat on the understanding ... between the directors and the organization, but generally limited to advisory management." Because the advisory directors lacked the authority or power to direct management of United Group, they were free to put the interests of their own companies first and to act based upon their companies' best interests.
Member companies associated with United Group to obtain larger discounts from paper manufacturers and suppliers. United Group's membership agreements guaranteed member companies the freedom to terminate their affiliation with the group upon thirty days' written notice. This requirement of written notice was the only restriction upon a member's right to terminate its association with United Group.
Conduct does not violate the Louisiana Unfair Trade Practice Law unless it is undertaken with the specific intent to harm the competitor. Monroe Medical Clinic, Inc., 622 So.2d at 766. The evidence in this case shows that these advisory directors affiliated with CDI not to harm United Group, but rather to protect the interests of their own companies and the companies they represented.
The evidence shows that after the Hilton Head conference and the violent reaction by the membership to Bancroft's attempt to sell the company to the Swiss corporation, United Group was in real trouble. Members representing 50-80% of the group's revenues were seriously considering terminating their association with United Group. With the imminent and substantial reduction of the aggregate purchasing power, membership in United Group was no longer sound or practicable.
Bancroft testified that the offer to purchase his stock on March 13, 1990, signed by *1347 thirty of United Group's members and advisory directors, put him on notice that at least those parties were considering alternatives to continued membership in the buying group. He further stated that he found nothing improper in the members and advisory directors meeting to consider his offer to sell as well as other courses of action.
Plaintiffs also claimed that the advisory directors, while still affiliated with United Group, induced other members to leave United Group and join CDI. This claim completely ignores the primary duty of the advisory directors, which was to represent the interest of the member companies in their respective regions. The evidence reveals that the members who attended meetings to discuss their options, which included the formation of a competitive buying group, were there because of dissatisfaction with Bancroft and United Group following the Hilton Head convention. The disgruntled members and advisory directors, unable to successfully negotiate for the purchase of United Group, began the process of forming a new entity before they terminated their affiliation with United Group. They had the right to evaluate their options, including the formation of another buying cooperative, and terminate, with proper notice, their connection to United Group.
Plaintiffs also alleged that the advisory directors plotted to "hire away" United Group's employees. Even if there was evidence to support this claim, which there is not, plaintiffs have failed to establish any wrongful conduct on the part of the advisory directors. Through her attorney, who also represented the dissatisfied members and advisory directors, Ms. Vinson let it be known that she was available for employment. Ms. Vinson was thereafter instrumental in effecting Jay Marcel's and Gale Hodge's hiring by CDI. In the absence of an agreement, there is no restriction on the freedom of association that is inherent in the hiring of employees and the taking of a job with another employer. First Page v. Network Paging Corporation, 628 So.2d 130 (La. App. 4th Cir.1993), writ denied, 93-3193 (La.2/11/94), 634 So.2d 379.

II. FORMER EMPLOYEES
Plaintiffs alleged that Susan Vinson misappropriated trade secrets, failed to tell Bancroft about plans to form a competitive group and negotiated for employment prior to resigning from United Group. We will discuss each of these claims except for plaintiffs' trade secret claim, which was addressed previously.
In Wyatt, supra, Patricia Voorhies was the president, 50% owner and key employee of PO2, Inc., a medical supply distribution company. Upon the death of the other 50% owner, Lisa Stevenson, Ms. Voorhies sought to purchase Ms. Stevenson's share of the business from Faris Wyatt, Ms. Stevenson's mother and administratrix of her estate. Ms. Voorhies continued to operate the business, but advised Ms. Wyatt that she and her husband would leave PO2 if they failed to negotiate a buy-out by the year's end.
Negotiations were unsuccessful and in December 1993, Ms. Voorhies and her husband, Jeffery Voorhies, established a competing company, Fresh Air Medical Equipment, Inc. Mr. Voorhies left PO2 in January 1994 and Ms. Voorhies resigned effective February 14, 1994. Two other employees also resigned from PO2 and went to work for Ms. Voorhies at Fresh Air. The evidence established that PO2 lost approximately 75% of its clientele and 85-90% of its business to Fresh Air as a result of personal solicitation of its clients by Ms. Voorhies and the former PO2 employees.
Ms. Wyatt sued PO2 and Ms. Voorhies, alleging unfair trade practices. The trial court rejected Ms. Wyatt's claim, finding that Ms. Voorhies' actions did not offend public policy or constitute unfair trade practices.
In the instant case, the evidence shows that Susan Vinson communicated with members and advisory directors who were considering withdrawing from United Group to form a competing buying cooperative. *1348 These communications took place at a time of tension and strain in United Group and at a time when Ms. Vinson's and Bancroft's relationship had deteriorated into "staring contests" and uncertainty over the future of their association.
Without a restrictive agreement, at the termination of her employment, an employee can go to work for a competitor or form a competing business. Even before termination, the employee can seek other work or prepare to compete, except that she may not use confidential information acquired by her from her previous employer. As noted by the court in Wyatt, supra, an employee's involvement in forming a competitive entity, including the solicitation of business and the hiring of employees, prior to terminating her current employment relationship, is not an unfair trade practice. Ms. Vinson had a right to explore alternatives to her current employment and to change jobs. She had no duty or obligation to disclose to Bancroft her intent to seek other employment.
Although many of United Group's members withdrew from the buying group after the Hilton Head catastrophe, only half of them joined CDI. While there is no evidence that Ms. Vinson was involved in the solicitation of United Group's members, we note that solicitation of customers after the end of an employment relationship does not form the basis for a claim of unfair competition. First Page, supra, citing Ahmed v. Bogalusa Kidney Care Center, 560 So.2d 485 (La.App. 1st Cir.1990), writ denied, 564 So.2d 324 (La.1990). Further, a former employee who enters business in competition with her former employer necessarily utilizes the experience she acquired and the skills she developed while in her former employment. National Oil Service of Louisiana, Inc. v. Brown, 381 So.2d 1269 (La.App. 4th Cir. 1980). An employee such as Ms. Vinson, who had been with Bancroft for more than twenty years, also brings with her other intangible and invaluable assets, including previous business contacts and relationships and specialized knowledge of many aspects of her employer's business.
We also find no support for the jury's conclusion that Ms. Vinson breached some unspecified duty to United Group. As a corporate officer, Ms. Vinson owed fiduciary duties to United Group. There was no evidence that Ms. Vinson did not faithfully continue her duties as president of United Group until the day she resigned and went to work for CDI. Even with the tension between himself and Ms. Vinson, Bancroft could find no fault with Ms. Vinson's performance of her job duties.
There is even less evidence to support the jury's findings regarding Gale Hodge. Plaintiffs' theory was that Ms. Hodge was a "mole" providing CDI and Susan Vinson with current business information about United Group. Ms. Vinson resigned on May 15th while Ms. Hodge left United Group on June 5, 1990. Thus, this claim involves a 20-day time frame.
Competition and free enterprise are favored. As long as conduct is neither unlawful nor offensive to public policy, persons are able to discuss changes of employment, effectuate a change of employment, plan to compete and take preliminary steps in furtherance of that plan. Orkin Exterminating Company v. Foti, 302 So.2d 593 (La.1974); First Page, supra.
Approximately two weeks passed between Susan Vinson's and Gale Hodge's resignations from United Group. Tobie McKown, who succeeded Ms. Vinson as president of United Group, testified that after Ms. Vinson quit, he found a fax from one of United Group's suppliers in Ms. Hodge's wallet. The fax, which Ms. Hodge had previously given to him, was an interoffice memorandum reflecting the supplier's concern over the future of United Group. Ms. Hodge explained that the memo was in her purse because she was concerned about her job and wanted to discuss it with her husband.
Plaintiffs also introduced telephone records for the month of May 1990 showing over six hours of after-business calls from Ms. *1349 Vinson's home in Monroe to Ms. Hodge's home in Spencer, Louisiana. Ms. Hodge testified that she only worked half-days for the last two weeks in May 1990 because her children had the chicken pox and she needed to be home. There was no testimony to establish the substance or nature of these calls, much less that they involved any unlawful acts under the Louisiana Unfair Trade Practices Act. The above constitutes the entirety of plaintiffs' case against Ms. Hodge.
There is no basis for the jury's imposition of liability against either Susan Vinson or Gale Hodge.

III. THE COMPETITION
We further find no legal or factual basis for the jury's findings of liability against CDI. A review of the charge to the jury reveals that the jury was given no instruction addressing a legal basis for CDI's purported liability. The very fact that the jury found CDI, a legal entity empowered by law with a personality separate from that of its owners, employees and officers, liable illustrates the jury's confusion. Obviously, CDI, who was not even in existence when the alleged unlawful conduct occurred, owed no duty to United Group.

CONCLUSION
Based upon our determination that the jury's verdict against defendants is based neither in law nor in fact and must be set aside, we do not reach defendants' other assignments of error.
IT IS ORDERED, ADJUDGED AND DECREED that there be judgment in favor of defendants-appellants rejecting the demands of plaintiffs-appellees at appellees' cost.
REVERSED AND RENDERED.

APPLICATION FOR REHEARING
Before SEXTON, BROWN, WILLIAMS and GASKINS, JJ. and CLARK, J. Pro Tem.
Rehearing denied.
NOTES
[1] The member companies feared that the Swiss corporation was buying United Group's stock for access to the U.S. market and as an opportunity to take over independent paper companies. With its superior resources, Muhlebach/Holzstoff could drive member companies out of business and/or obtain these companies for a fraction of their worth. The proposed sale was perceived as a threat to the member companies and as a betrayal of their trust.
[2] Plaintiffs filed amended petitions on December 11, 1992, and February 2, 1994, to correct references to the status of the individual defendants, who served as advisory directors of United Group, and to add a claim under the Louisiana Unfair and Deceptive Trade Practices Act, LSA-R.S. 51:1401, et seq.
[3] On April 24, 1995, plaintiffs voluntarily dismissed Goodman from the suit.