705 So.2d 1210 (1998)
Joseph L. BARBE, Jr.
v.
A.A. HARMON & COMPANY (A Corporation of Certified Public Accountants), Terrell J. LeGlue, Glenn V. Weick, Mark R. Munson, Vincent J. Giardina, Kenneth M. Perret, Ellis J. Roussel, Jr. and David M. Bassemier.
Nos. 94-CA-2423, 94-CA-2424.
Court of Appeal of Louisiana, Fourth Circuit.
January 7, 1998.
Rehearing Denied January 30, 1998.
*1213 Henry A. King, Timothy S. Madden, Nesser, King & LeBlanc, New Orleans, for Plaintiff/Appellee Joseph L. Barbe, Jr.
Stephen L. Williamson, Montgomery, Barnett, Brown, Read, Hammond & Mintz, L.L.P., New Orleans, and Kenneth P. Carter, New Orleans, for Defendants/Appellants A.A. Harmon & Co., Terrell J. LeGlue, Sandra A. LeBlanc LeGlue, Glenn V. Weick, Susan G. Weick, Mark R. Munson, Virginia C. Munson, Vincent J. Giardina, Donna L. Giardina, Kenneth M. Perret, Myra C. Perret, Ellis J. Roussel, Jr., Barbara M. Roussel, David M. Bassemier and Kathleen G. Bassemier.
Robert L. Marrero, Bowes & Marrero, L.L.P., Gretna, for Defendants/Appellants Cynthia L. Traina, Trustee for the Bankrupt Estate of Harmon & Company, CPAs, and Harmon & Company, CPAs.
Before KLEES, LOBRANO, PLOTKIN, WALTZER and MURRAY, JJ.
MURRAY, Judge.
This is a consolidated appeal of two judgments in favor of Joseph L. Barbe, Jr. The consolidated cases involve claims by Mr. Barbe against his former employer, A.A. Harmon & Co. (A Corporation of Certified Public Accountants), and its individual shareholders[1] relating to his termination as an employee (Case # 89-26356, referred to hereafter as the termination suit), and against Harmon, the individual shareholders and their spouses[2] related to the redemption of Mr. Barbe's stock in Harmon (Case # 90-3833, referred to hereafter as the stock redemption suit). Following a lengthy trial, the jury found that Harmon violated the laws against age discrimination, breached Mr. Barbe's employment contract and an implied covenant of good faith, and were guilty of unfair and deceptive trade practices; it *1214 awarded a lump sum of $616,000.00 to Mr. Barbe in the termination suit. The jury also found that the individual shareholders breached the stock redemption agreement with Mr. Barbe; it awarded $299,623.50 to Mr. Barbe in the stock redemption suit. The court entered judgment, dated December 2, 1993, in each case against Harmon and the individual shareholders in the amounts awarded by the jury.
On January 31, 1994, the court entered judgment denying defendants' motion to amend the judgment or alternatively for new trial, and granting plaintiff's motion to amend judgment or alternatively for judgment notwithstanding the verdict. In that judgment the court ordered that the judgments entered on December 2 were supplemented and amended as evidenced by amended judgments signed on January 31, 1994. The amended judgment in the stock redemption suit added the wives of the defendant-shareholders as judgment debtors, and provided for stipulated interest and attorney's fees and all costs. The amended judgment in the termination suit provided for stipulated interest and attorney's fees and all costs.
Harmon and the individual defendants appealed, assigning both factual and legal errors. They contend that the trial court erred by: improperly instructing the jury as to the claims in both the stock redemption and termination suits; adopting the jury verdicts, which were manifestly erroneous, in both cases; naming the individual defendants as judgment debtors in the termination suit; naming the defendant wives as judgment debtors in the stock redemption suit; naming the individual shareholders as judgment debtors in the termination suit; and failing to award judgment in favor of Harmon on its Reconventional Demand.
For the following reasons, we affirm in part and reverse in part, and remand.

FACTS:
John McGrath[3] hired Mr. Barbe in June 1961 to work for A.A. Harmon & Co., the predecessor partnership to defendant Harmon, as a staff accountant. Mr. Barbe became a partner in the firm in 1963 when he became a certified public accountant. The partnership was successful and grew. In 1979, in response to that growth and in order to capitalize on more favorable tax treatment and limit liability, the partners elected to change the business structure of their accounting practice to a corporation. Harmon began operating as A.A. Harmon & Co. (A Corporation of Certified Public Accountants), on April 1, 1980. At that time, the former partners (Mr. Barbe, John McGrath, Xavier Hartmann and Terrell LeGlue) executed employment contracts and agreements relating to stock redemption and deferred compensation. Mr. Barbe was elected president, and served in that capacity until September 5, 1989. During that period new shareholders were added.[4] Each new shareholder executed an employment contract, a Stock Redemption Agreement and a Deferred Compensation Agreement.[5]
On August 18, 1989, the other defendant-shareholders hand-delivered to Mr. Barbe a letter advising him that they recognized a need for a major change in the organizational and economic structures of the firm. The letter advised that a special shareholders meeting was scheduled for September 5, 1989, and that, among other actions, the shareholders were prepared to vote to authorize the newly-elected board of directors to take "... whatever action necessary and appropriate... to negotiate with Mr. Joseph L. Barbe, Jr., regarding his early retirement, disassociation from and/or termination of employment with the corporation." This letter *1215 advised Mr. Barbe that the defendant-shareholders wished to accomplish the changes outlined with as little turmoil as possible. In an effort to do so, they offered to Mr. Barbe the opportunity to retire effective November 1, 1989, upon the terms and conditions set forth in the letter. The defendant-shareholders also advised Mr. Barbe that his employment contract would not be renewed when it expired, even if he decided to reject the opportunity to retire. The letter provided that the offer to retire would expire at 5 p.m. on August 25, 1989.
Mr. Barbe rejected this proposal in writing and at the shareholders meeting on September 5, 1989. On September 11, 1989, Harmon formally notified him that his employment contract would not be renewed when it expired on October 31, 1989. Mr. Barbe, who was fifty-eight years old at the time of his termination, filed two separate lawsuits, one relating to his termination as an employee and another relating to the redemption of his Harmon stock. Harmon and the individual defendants answered, filing general denials in each suit. Harmon also reconvened in both lawsuits contending it was owed a minimum of $337,152.56 in liquidated damages stemming from Mr. Barbe's breach of a non-competition clause in his employment contract, and asserting that it was entitled to offset the amounts Mr. Barbe demanded under the stock redemption agreement.

DISCUSSION:

AGE DISCRIMINATION:
The jury found that Harmon committed "unlawful age discrimination" against Mr. Barbe. The defendants contend that Mr. Barbe was not an "employee" so to be covered by the Louisiana Age Discrimination in Employment Act, ("LADEA"), La.Rev.Stat. 23:971, et seq. and the Louisiana Human Rights Commission Act ("LHRCA"), La.Rev. Stat. 51:2233, the statutes applicable to Mr. Barbe's age discrimination claim. The defendants also contend that, even if Mr. Barbe were covered by the statutes, the instructions given the jury as to the age discrimination claim were erroneous and/or misleading, and that the evidence introduced at trial was not sufficient to support this claim.
We first address the defendants' argument that the instructions given the jury were misleading. Age Discrimination in Employment is governed by Part IV of Chapter 9 of Title 23 of the Louisiana Revised Statutes. Because the prohibition against age discrimination under the Louisiana Act is identical to that of the federal statute prohibiting discrimination on the basis of age (see, Lege v. N.F. McCall Crews, Inc., 625 So.2d 185 (La.App. 3d Cir.), writ denied, 627 So.2d 638 (1993), citing Belanger v. Keydril Co., 596 F.Supp. 823 (E.D.La.1984)), we have looked to federal case law for guidance with regard to the jury instructions in a claim of discrimination based on age. A plaintiff creates a rebuttable presumption of discrimination by establishing a prima facie case of age discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). In order to make a prima facie showing of age discrimination, a plaintiff must establish that: 1) he is between the ages of forty and seventy; 2) that he was qualified for the job at issue; and 3) that an employee outside the protected class was treated more favorably. La.Rev.Stat. 23:972(G); Deloach v. Delchamps, Inc., 897 F.2d 815, 818 (5th Cir.1990). Once a plaintiff has made a prima facie showing of discrimination, an employer may rebut that presumption by articulating some legitimate, non-discriminatory reason for its action. Id. If the employer meets its burden, the plaintiff may then establish discrimination by showing that the reason given by the employer is merely pretextual and that age was a determinative reason for the employer's action. Id. The ultimate question the jury must decide is whether the defendant terminated the plaintiff because of his or her age.
Harmon argues that the jury instructions given by the trial court were incomplete and inaccurate, and did not clearly instruct the jury as to the ultimate question to be answered. Although the court gave instructions on what was necessary to establish a prima facie case and the burden of proof, Harmon argues it added instructions on causation that did not include an essential explanation of the "but for" standard of causation.
*1216 Although the actual words "but for" are not necessary for a jury instruction to be accurate and complete, the instruction must advise the jury that, in order for age to be a determinative factor, it is necessary that the event (in this case the non-renewal of Mr. Barbe's contract) would not have occurred if the plaintiff had been younger. See Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); Holzman v. Jaymar-Ruby, Inc., 916 F.2d 1298 (7th Cir.1990). In Holzman, the court found the following instruction to be acceptable:
It is not enough that age discrimination be present or even that it figured in the decision to fire plaintiff.... In order to find that age was a "determining factor" you must find that age made a difference in the sense that plaintiff would not have been discharged had he been younger. (emphasis added)
"A trial court is given broad discretion in wording its jury instructions and will not be reversed as long as the charge correctly states the substance of the law." United States v. L'Hoste, 609 F.2d 796, 805 (5th Cir.), cert. denied, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980). However, Louisiana Code of Civil Procedure art. 1792(B) provides that a trial court has the duty to give accurate and necessary jury instructions based upon the particular facts and evidence of the case. Delphen v. Dept. of Transportation & Development, 94-1261, p. 4 (La.App. 4th Cir. 5/24/95), 657 So.2d 328, 332, writs denied, 95-2116, 95-2124 (La.11/17/95), 663 So.2d 716-17. The adequacy of jury instructions must be determined in light of the instruction as a whole. Clark v. Jesuit High School of New Orleans, 96-1307, p. 7 (La. App. 4th Cir. 12/27/96), 686 So.2d 998, 1003.
The trial court instructed the jury as follows:
If the employer introduces evidence to show that it had a legitimate basis other than age for terminating the employee, you, the jury, may nevertheless find the reason presented by the employer are (sic) merely pretextual and age was a determinative reason for the employer's action.
A plaintiff employee only has to present some evidence of differential treatment between older and younger employees to create a presumption of age discrimination.
Therefore, if a younger employee was promoted but an older employee in a similar position was not, or an older employee was discharged while a younger employee was not, a presumption of age discrimination is created.
It is not necessary that age be the only factor in the employer's determination to terminate an employee in order for the employee to prevail on a claim of age discrimination.
Evidence of discrimination on the basis of economic factors related to age may support a verdict of age discrimination.
For the purpose of plaintiff's age discrimination claim, you must not consider or be influenced by or pass judgment on whether the nonrenewal of plaintiff's employment contract was or was not fair or correct, since it is not your province as jurors to pass judgment on employment actions, unless the plaintiff's age was a motivating factor.
The jury was instructed that age must be a determinative factor (without further explanation), then instructed on presumptions, then instructed about economic factors supporting a verdict of age discrimination, then told that it should not consider the correctness of the contract, and then told that it could not pass judgment on employment actions unless Mr. Barbe's age was a motivating factor. At no point do the instructions advise the jury, in clear and unequivocal language, that they must find that Mr. Barbe's employment contract would have been renewed if he had been younger in order for them to conclude that age was a determinative factor in the decision not to renew. We agree with Harmon that this instruction is inadequate and misleading.
Not every erroneous or inadequate jury instruction will justify a de novo review. Only where the charge is so inadequate so as to preclude the jury from reaching a verdict based on the law and facts, may we review the record de novo. The question to be determined is whether the jury was misled to such an extent that it was prevented *1217 from dispensing justice. Clark, 96-1307 at p. 8, 686 So.2d at 1003.
In Walther v. Lone Star Gas Co., 952 F.2d 119, 127 (5th Cir.1992), the employer, Lone Star, argued that the substance of the jury instructions on a prima facie case of age discrimination was erroneous. The court noted as a preliminary matter that it was inappropriate to submit the issue of prima facie case to the jury. When the defendant has produced evidence of a nondiscriminatory reason for the termination, and the plaintiff has had an opportunity to challenge that reason as pretextual, the initial prima facie case is no longer relevant. The trier of fact should proceed directly to the ultimate issue. Id. at 126-127. Although the court found that instructing the jury on the elements of a prima facie case, presumptions and the shifting burden of proof was unnecessary and confusing, the court was not persuaded that this error was probably responsible for an incorrect verdict. Because the jury specifically found that the plaintiff had proved that the defendants' stated motives for his discharge were pretextual and that, but for the motive of age discrimination, he would not have been terminated, any error in the jury instruction was harmless. Id.
The only jury interrogatory on the issue of age discrimination in this case asked "Did the defendant, A.A. Harmon & Co., commit unlawful age discrimination against Joseph L. Barbe, Jr.?" The jury's answer to that interrogatory, unfortunately, cannot help us in determining if the jury specifically concluded that Harmon's stated reason for Mr. Barbe's discharge was pretextual, and that he would not have been terminated but for the motive of age discrimination. We find that the jury instruction given on age discrimination in this case was misleading and confusing and did not adequately state the substance of the law, and that the inadequate and misleading jury charge probably was responsible for an incorrect verdict. Accordingly, a de novo review of the record on this issue is required. Ferrell v. Fireman's Fund Ins. Co., 94-1252, p. 4 (La.2/20/95), 650 So.2d 742, 747.
Mr. Barbe was fifty-eight years old when Harmon voted not to renew his employment contract. He contends that Harmon terminated him in order to avoid paying him salary and fringe benefits until the mandatory retirement age of sixty-five,[6] and retirement benefits. He argues that these economic factors were a proxy for age, and that his termination, therefore, was based on age discrimination.
Harmon counters that its decision not to renew Mr. Barbe's contract was not based on his age or economic factors. Rather, it alleges that it decided not to renew Mr. Barbe's contract because of his "dictatorial, bullying personality," which caused them grave concern over the future of the firm and its economic survival. In addition, Harmon argues that Mr. Barbe's contention that economic considerations were a proxy for age is without merit because it offered to pay to him benefits under the Deferred Compensation Agreement that it believed legitimately could have been denied him.
Based on our review of the record we conclude that Mr. Barbe did not carry his burden to prove that age was a determinative factor in Harmon's decision not to renew his employment contract. The record supports the finding that the reason given by Harmon for Mr. Barbe's termination was not a mere pretext.
The record shows that two of the early Harmon shareholders, John McGrath and Xavier Hartmann, retired in 1988. Relations between Mr. Barbe and his fellow shareholders, which had been difficult at best, began to deteriorate rapidly thereafter. The individual defendants testified that they had endured Mr. Barbe's behavior for years because of Mr. McGrath. Mr. Barbe became even more domineering and overbearing after the retirement of Mr. McGrath, who had acted as a buffer. To a man, every defendant-shareholder testified that Mr. Barbe was abusive, abrasive, dictatorial and retained *1218 an attitude of "my way or no way." Each testified that, in his view, Mr. Barbe had a total disregard for the good of the firm. He bullied, intimidated, humiliated, criticized and demeaned every firm employee and shareholder with whom he dealt. The individual defendants testified that Mr. Barbe's behavior and self-interest caused them to be very concerned for Harmon's economic survival.
Harmon offered Mr. Barbe the opportunity to retire, and agreed to redeem his stock at a higher valuation than was required by the stock redemption agreement in the event of termination. In addition, Harmon agreed to pay Mr. Barbe retirement benefits of $4,166.67 for sixty months ($250,000), as if he had retired at age sixty, although the Deferred Compensation Agreement provided that all rights thereunder terminated if he resigned or was removed.[7]
Mr. Barbe argues that the offer of retirement was not serious because it was non-negotiable and included a condition that he cooperate with Harmon in connection with the lease of the firm space.[8] Mr. Barbe described this condition as "golden handcuffs."
This argument is not supported by the record. The package offered to Mr. Barbe would have entitled him to retirement benefits as if he had retired at age sixty, benefits to which he would not be entitled if he were terminated. It also would have resulted in his stock having a higher redemption value than it would have if he were terminated. The offer was made in writing, and Mr. Barbe was given a week in which to consider it. Even after Mr. Barbe rejected the offer Harmon's attorneys met with his attorneys in an effort to amicably resolve the matter.[9] These discussions took place on August 28, and resulted in a verbal offer by Mr. Barbe that was reduced to writing by his attorney on that date. The defendant-shareholders testified that they believed that the firm would be bankrupted if it agreed to Mr. Barbe's terms. Consequently, it advised Mr. Barbe on September 11 that his contract would not be renewed when it expired on October 31, 1989.
Based on all the evidence we do not find that age was a determinative factor in Harmon's decision not to renew Mr. Barbe's employment contract. Harmon articulated a legitimate, non-discriminatory reason for its action. Mr. Barbe's assertion that the stated reason was a pretext, and that economic considerations relative to age were the actual reason for the action, is not supported by this record. We, therefore, reverse the portion of the judgment awarding damages to Mr. Barbe for age discrimination.
Because we find that Mr. Barbe was not discriminated against on the basis of age we need not address the defendants' contention that Mr. Barbe was not an employee for purposes of the LADEA.

BREACH OF EMPLOYMENT CONTRACT:
The jury found that Harmon breached the contract of employment between it and Mr. Barbe. Harmon argues that this finding is manifestly erroneous. We disagree.
In support of the jury's verdict, Mr. Barbe argues that the evidence establishes that Harmon breached the employment contract in three ways: Harmon terminated him without good cause, as required by an unwritten understanding that modified the contract; Harmon fired him on August 18, 1989 before his contract expired; and, Harmon did not pay him the bonus for fiscal year-end October *1219 31, 1989, to which the contract entitled him.
Paragraph 5 of Mr. Barbe's written employment contract provides that the initial term of his employment commenced on April 1, 1980, and continued to October 31, 1980, and thereafter was deemed renewed automatically, under the same terms and conditions, for successive one year terms, until either party, at least thirty days prior to the expiration of the term, gave written notice to the other of the intention not to renew such employment.[10]
On this issue the contract is clear and unambiguous. There is only one condition that must be met in order to prevent the automatic renewal: written notice of the intention not to renew by either party to the other thirty days prior to the contract's expiration.
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. Civ.Code Ann. art.2046. This rule applies to employment contracts. See, e.g., Tompkins v. Schering Corp., 441 So.2d 455, 458 (La.App. 2d Cir.1983). The meaning and intent of the parties to a written instrument is ordinarily determined within the four corners of the document, and extrinsic evidence is inadmissible either to explain or contradict the terms of the instrument. Brown v. Drillers, Inc., 93-1019 (La.01/14/94), 630 So.2d 741, 748. Thus, we find that Harmon's decision to exercise its right not to renew Mr. Barbe's contract does not support the jury's finding that it breached the employment contract.
Nor do we find that the employment contract was breached when Mr. Barbe was told that he should not report to work. The letter of August 18, 1989, advised Mr. Barbe that he immediately would be on inactive status and asked that he not report to work at the Harmon office or the office of any of its clients, unless specifically requested to do so.[11] This was in accord with paragraph 1 of the employment contract which provided:
The Employer hereby employs and engages the Employee as an accountant, and the Employee hereby accepts said employment and agrees to perform all services required of him as such and all other services that he is qualified to perform... which the Employer might request him to perform, all to the satisfaction of the Employer. (emphasis added)
When Mr. Barbe elected not to accept Harmon's offer to retire, he was notified by letter dated September 11, 1989, that his contract would not be renewed when it expired on October 31. The record establishes that Harmon tendered to Mr. Barbe checks for salary and the fringe benefits due him as an employee and paid his insurance through the end of the contract term. Thus, we do not find that Mr. Barbe was "fired" in violation of his contract.
We turn now to Mr. Barbe's claim that the contract was breached when Harmon did not pay him the year end bonus to which that contract entitled him. Paragraph 3 of the employment contract provided that Mr. Barbe would receive a fixed amount of monthly salary for the first fiscal year of his employment, and in subsequent years he was to receive a monthly salary in such amount as may be determined and fixed by Harmon. In addition, paragraph 3 provided that Mr. Barbe was entitled to receive a year-end bonus at the end of each corporate fiscal year he was employed. Finally, paragraph 3 provided that the amount of the bonus was to be *1220 determined by Harmon and paid within a reasonable period of time after the end of the fiscal year. The contract, however, is silent as to the method by which Harmon was to determine the amount of bonus to be paid.
Louisiana Civil Code art.2053 provides that "a doubtful provision must be interpreted in light of the nature of the contract, equity, usages, [and] the conduct of the parties before and after the formation of the contract ...." (emphasis added). See Amoco Production Co. v. Fina Oil & Chemical Co., 95-1185, p. 12-13 (La.App. 1st Cir. 02/23/96), 670 So.2d 502, 511, writ denied, 96-1024 (La.05/31/96), 673 So.2d 1037. Because the employment contract does not express the parties' intent as to the method of calculating year-end bonus, parol evidence must be used to determine that intent. Liljeberg Enterprises, Inc. v. Lifemark Hospitals of La., Inc., 620 So.2d 1331, 1336 (La.App. 4th Cir.), writs denied, 621 So.2d 818 (La.1993). A good way to determine what parties to a contract intended is to look at the method in which the contract is performed, particularly if done consistently over and over again for a period of time. Gamble v. D.W. Jessen & Associates, 509 So.2d 1041, 1043 (La.App. 3d Cir.), writ denied, 514 So.2d 454 (La.1987).
There is no dispute that Harmon had calculated year-end bonuses in the same manner since its incorporation. Once the firm's net profit was determined, a bonus would be distributed to the shareholder-employees on the basis of their percentage of Harmon stock ownership. It was established that the total amount to be distributed as bonus by Harmon for fiscal year-end October 31, 1989, was $97,000.00. Mr. Barbe testified that he was entitled to a year-end bonus of $31,903.30, based on his ownership of 32.89% of the Harmon stock. David Bassemier, a defendant-shareholder, agreed that, using the method for calculating bonus that had always been used, Mr. Barbe was entitled to a bonus in excess of $30,000 for fiscal year-end 1989. However, Harmon changed its method of making this calculation after it decided not to renew Mr. Barbe's employment contract. Using the new method, Harmon determined that Mr. Barbe was due no bonus for year-end 1989.
Although Harmon attempted to establish that the shareholder percentage method was not equitable, and that all the shareholders, including Mr. Barbe, had discussed changing it, the record is devoid of any evidence that any action had been taken to do so.
It was reasonable for the jury to infer that it was the intent of the parties to use the method for calculating year-end bonuses which had been used for the prior years. It follows that it also was reasonable for the jury to conclude that Harmon breached the employment contract by deviating from the method of calculation for the fiscal year ended October 31, 1989. Mr. Barbe is entitled to receive $31,903.30, the amount of bonus to which the employment contract entitled him.

BREACH OF IMPLIED GOOD FAITH:
The jury found that Harmon had breached a covenant of good faith in connection with Mr. Barbe's employment contract. Harmon argues that this finding is not supported by the record. We disagree.
In order to establish that Harmon breached an implied covenant of good faith in connection with Mr. Barbe's employment contract, Mr. Barbe was required to prove that Harmon violated that agreement with a dishonest or morally questionable motive. See Bond v. Broadway, 607 So.2d 865 (La. App. 2d Cir.1992), writ denied, 612 So.2d 88 (La.1993).
The record establishes that Joseph Barbe had already worked ten of the twelve months of the fiscal year when he was put on "inactive" status and notified that his employment contract would not be renewed. The evidence also establishes that Harmon changed the method it used to calculate year-end bonus after it decided not to renew Mr. Barbe's contract. Under the method that had been used since Harmon was incorporated Mr. Barbe would have been owed $31,903.30. However, the new method of calculation resulted in bonuses being owed to the defendant-shareholders, but no bonus being owed to Mr. Barbe or another shareholder-employee whose contract was not renewed.
*1221 Thus, the record establishes that Harmon changed its method for calculating year-end bonuses only after Mr. Barbe was terminated in a manner that was detrimental to Mr. Barbe, and advantageous to the defendant-shareholders. Based on these facts, the jury reasonably could have inferred that Harmon was in bad faith when it breached Mr. Barbe's employment contract.
Louisiana Civil Code art.1997 provides: "An obligor in bad faith is liable for all the damages in the record, foreseeable or not, that are a direct consequence of his failure to perform." From the record before us, we conclude that Mr. Barbe is owed the $31,903.30 due him as his 1989 bonus. There is no evidence of any consequential damages. Additionally, according to Louisiana Civil Code art.2000, "when the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due,...." The employment contract provided that the year-end bonus would be paid within a reasonable period of time after the end of the fiscal year. The record reflects that a letter was sent to Mr. Barbe on October 31, 1989, transmitting a check which included his "bonus." We therefore conclude that interest is due on Mr. Barbe's bonus of $31,903.30 at the rate of legal interest as fixed by La. Civ.Code art. 2924.[12]

UNFAIR TRADE PRACTICE:
The jury also found that Harmon had engaged in unfair methods of competition or unfair or deceptive trade practices as to Mr. Barbe, following his departure from the firm.
Mr. Barbe alleged that Harmon had violated the Louisiana Unfair Trade Practices and Consumer Protection Law (LUTPCPL), La. Rev.Stat. 51:1401, et seq., when it reconvened against him for liquidated damages of $152,146.31 for his violation of the non-competition clause contained in the employment contract.
Louisiana Revised Statute 51:1409(A) provides in pertinent part:
Any person who suffers any ascertainable loss of money or movable property, ..., as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages....
The record contains no evidence that Mr. Barbe suffered any ascertainable loss of money because of Harmon's petition in reconvention. Despite the reconventional demand Mr. Barbe set up a new business, in competition with Harmon, and contacted Harmon clients in attempting to build his business. He apparently was quite successful in his efforts. Regardless of whether the non-competition clause was enforceable, Mr. Barbe did not suffer any economic loss as a result of Harmon's attempt to enforce it. The jury finding on this issue is erroneous as a matter of law, and is reversed.

COVENANT NOT TO COMPETE:
Harmon argued that the jury erred when it determined that the "liquidated damages" clause of Mr. Barbe's employment contract was unenforceable, and failed to award it liquidated damages pursuant thereto. We disagree.
The clause at issue, identified as a "Covenant Not to Compete" in the contract, provided that following termination from the firm for any reason, the employee agreed that he would not accept any accounting or tax engagement from any individual, corporation or other entity which was a client of Harmon at the time of his termination or at the time of acceptance of such engagement. The clause was effective for two years following termination. If a former employee violated this clause the damages were to be computed as the greater of two hundred percent of the fee charged by Harmon to that client in the prior year, or two hundred percent of the fee charged by the employee for a one year period.
Because the employment contract at issue herein was executed in 1980, La.Rev.Stat. 23:921, as amended in 1962 is applicable to this case. The applicable statute provided:

*1222 No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court, provided that in those cases where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree to bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged in ... for a period of two years. (emphasis added)
The italicized portion of the statute reflects the provision added by the 1962 amendment.
Harmon argues that the "Covenant Not to Compete" in the employment contract does not limit Mr. Barbe's ability to compete in his occupation or restrict him from engagement of firm clients so that it is not a non-competition clause as contemplated by La.Rev.Stat. 23:921. Harmon characterizes this covenant as a liquidated damages clause, which this court's decision in Winston v. Bourgeois, Bennett, Thokey & Hickey, 432 So.2d 936 (La.App. 4th Cir.1983) mandates be enforced.
Winston involved the application of a provision in the partnership agreement of a firm of certified public accountants. The agreement provided that any partner who withdrew from the firm would owe the firm fifty percent (50%) of one year's fees earned by him for accounting services performed for anyone who was a client of the firm at the time of his withdrawal. This provision was to be in effect for a period of eighteen months after the partner's withdrawal.
In considering the question of whether this provision violated the prohibition of La. Rev.Stat. 23:921, the court reviewed the jurisprudence and concluded that the "basic premise underlying the prohibition [against non-competition clauses] stems from the fundamental right of individuals to seek success in our free-enterprise society." Winston at 940. Considering the circumstances of Mr. Winston's situation and the contract provision the court concluded that Mr. Winston was not estopped from pursuing his career nor was he prohibited from pirating his firm's clients. Rather he was free to leave the firm and take some of its business with him as long as he paid reasonable and predictable compensation to it.
By contrast, the "Covenant Not to Compete" in Mr. Barbe's employment contract effectively would deprive this fifty-eight year old man, who had been employed by Harmon since 1961, of the liberty to earn his living as an accountant. If Mr. Barbe accepted work with any of Harmon's former clients he would owe to the corporation the greater of two hundred percent (200%) of the fees charged by Harmon to that client in the previous year or two hundred percent (200%) of the fees charged to that client by Mr. Barbe for a one year period. If we were to accept Harmon's argument, Mr. Barbe was free to leave the firm and compete with it for accounting business. If, however, he succeeded in the competition he would owe Harmon at least twice what he earned. If this provision were enforceable we envision a situation in which Harmon would beg its clients to flock to Mr. Barbe for their accounting needs; he would do all the work and they would reap twice the fees.
This case, therefore, is distinguished from Winston because the penalty provision at issue herein poses an insurmountable obstacle to Mr. Barbe's engaging in the practice of his profession. Because the principal obligation supporting the penalty provision is Mr. Barbe's agreement not to perform work for any of Harmon's clients, we find that La.Rev.Stat. 23:921 renders the covenant not to compete null and unenforceable.[13] *1223 McCray v. Cole, 259 La. 646, 251 So.2d 161, 164 (1971) (liquidated damages provision in employment contract between group of psychiatrists and psychologist associated with them which imposed penalty of $6,000 for psychologist's practice of psychology within a particular parish upon his withdrawal from the association held to be unenforceable) We, therefore, affirm the judgment as to this claim.

STOCK REDEMPTION:
The jury found that the manner in which the defendant-shareholders calculated the value of Mr. Barbe's stock breached the stock redemption agreement, and found $299,623.50 to be the correct price due Mr. Barbe for his Harmon stock. Harmon contends that this finding was error. We disagree.
On April 3, 1980, Mr. Barbe, Mr. LeGlue, Mr. Hartmann, and Harmon entered into an Agreement for the Sale and Redemption of Stock and for Preferential Rights of Acquisition. This agreement obligated Harmon to redeem and the shareholders to sell Harmon stock, pursuant to the terms of the agreement. Harmon agreed to redeem one hundred percent of the capital stock owned by the shareholder upon the occurrence of any one of a number of events, including the termination of employment, with or without cause, or for any other reason whatsoever. The agreement provided a formula to be used to establish the value of capital stock, which included book value and goodwill. The original agreement was amended to include each new shareholder. It was also amended in 1988 in order to alter the valuation formula. This amendment provided that the goodwill factor would be computed as either 1) an amount equal to 30% of the average annual earned fees of the corporation based on the preceding 36 months, or 2) the amount of goodwill included in the purchase price to such shareholder of the shares being redeemed, whichever was less, if the reason for redemption was the resignation or removal of a shareholder from employment.
The parties herein do not dispute the book value of Mr. Barbe's stock nor Harmon's right to value goodwill at the lesser amount arrived at using either option 1 or 2. The parties also agree that the goodwill value of Mr. Barbe's shares calculated according to option 1 is $71.70 per share. However, they disagree as to how to arrive at the value of goodwill under option 2.
Mr. Barbe argues that the goodwill included in his shares at the time he acquired them was equal to 100% of the total fees earned in the fiscal year ended March 31, 1980, the year preceding the transfer of assets from the partnership to the corporation, or $88.38 per share. Harmon contends that the goodwill value of Mr. Barbe's shares at the time of acquisition was equal to 30% of the average annual fees of the corporation for the 36 months preceding the 1980 transfer, or $25.39 per share.
If Mr. Barbe is correct as to the goodwill value of his shares at the time of acquisition his shares are valued at $299,632.50. If, however, Harmon is correct in its valuation of the goodwill of Mr. Barbe's shares at the time he acquired them, the total price to be paid him for his shares, in accordance with the agreement, was $185,006.25. The jury was asked to choose between these two values.
Terrell LeGlue, one of the defendant-shareholders, testified that Harmon could not determine the value of the goodwill at the time Mr. Barbe acquired his stock. For this reason, the corporation looked to Mr. McGrath for guidance. Mr. McGrath searched the firm's records and determined that the value per share was $25.39. Mr. McGrath, whose deposition was read to the jury, testified that the three former partners met in late 1979 and agreed to value the goodwill at 30% of the average annual fees, based on the 36 months preceding the transfer. *1224 In his opinion this method of valuation was to apply to the stock acquired by him, Mr. Hartmann, and Mr. Barbe at the time they transferred their interest in the partnership assets to the new corporation. Mr. McGrath acknowledged that the original shareholders used that valuation because the original shareholders wanted to attract new shareholders, and the price of the stock offered to them had to be something manageable. Xavier Hartmann, another of the original shareholders, agreed with this testimony.
Mr. Barbe testified that the goodwill value described by Mr. McGrath was to apply only to stock offered to future shareholders in order to make the purchase price more attractive. He testified that when the assets of the partnership were transferred to the corporation, he, Mr. McGrath and Mr. Hartmann agreed that the goodwill value would be 100% of the prior year's earnings. In support of this assertion, he offered the testimony of Robert Peyroux, an expert certified public accountant. Mr. Peyroux testified that the normal accounting practice in the 1970s and 1980s was to value the goodwill at 75% to 150% of the previous year's gross fees. On cross examination he admitted that this method was most commonly used in mergers of two separate entities. He acknowledged that the change of a business from a partnership to a corporation was not the same as a merger, and did not attempt to offer an opinion as to how the goodwill was valued in this case.
There are no documents that clearly establish the goodwill value of Mr. Barbe's stock at the time he acquired it. The jury was presented conflicting evidence on this question, and chose to believe Mr. Barbe. Where there are conflicts in the testimony, reasonable evaluations of credibility and reasonable inferences of fact will not be disturbed upon review, even if the appellate court believes its own conclusions are as reasonable. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). We cannot substitute our judgment for that of the jury on this question. Accordingly, the jury's finding that the correct price to be paid Mr. Barbe for his Harmon stock is $299,623.50 is affirmed.

AMENDED JUDGMENTS:
The defendants argue that the trial court erred when it entered amended judgments in each case. The judgment in the stock redemption suit was amended to add the defendant-shareholders' wives as judgment debtors and to provide for interest and attorney's fees per the stipulation of the parties. The judgment in the termination suit was amended to provide for interest and attorney's fees per the stipulation.
Mr. Barbe moved to amend the judgment or, alternatively, for judgment notwithstanding the verdict to add the defendant-shareholders' wives as judgment debtors and to incorporate the stipulation regarding interest and attorney's fees in that case. The trial court granted the alternative motion and amended the judgment as requested. He also amended the judgment in the termination suit, despite Mr. Barbe's failure to request such an amendment.[14]
Because of the wording of the trial court's judgment on the post-trial motions it is unclear which of Mr. Barbe's alternative motions was granted. However, since the court entered an amended judgment, adding the wives as judgment debtors, we assume that it is the motion to amend the judgment that was granted.
The trial court's authority to amend a judgment is limited. Louisiana Code of Civil Procedure art. 1951 provides that the court may amend a judgment: 1) to alter the phraselogy [sic] of the judgment but not the substance; or 2) to correct errors of calculation. Adding the shareholders' wives as judgment debtors or to provide for interest and attorney's fees pursuant to a stipulation of the parties is neither an amendment to correct phraseology or an error of calculation. The trial court erred when it granted the motion. The amended judgments entered in each case on January 31, 1994, are vacated.

*1225 DENIAL OF DEFENDANTS' MOTION FOR NEW TRIAL:

The defendant-shareholders moved for a new trial or alternatively for amended judgment, contending the judgment of December 2 improperly cast the individual shareholders as judgment debtors even though the jury had not been asked to consider their liability with regard to any of the claims for which it found Harmon liable. The trial court denied both motions. The defendants appeal the denial of their motion for new trial.
The interrogatories submitted to the jury in the termination suit asked it to consider the actions of A.A. Harmon & Co. on the claims of age discrimination, breach of contract, and breach of implied covenant of good faith. It is these interrogatories that were answered in the affirmative. The only interrogatory that asked the jury to consider the actions of the "defendants" related to Mr. Barbe's claim for intentional infliction of emotional distress. The jury answered "no" to the question "Did the defendants intentionally inflict emotional distress upon Joseph L. Barbe, Jr.?" The jury was not asked to consider whether the individual shareholders were liable for the other claims.
A motion for new trial shall be granted when the verdict or judgment appears clearly contrary to the law and evidence. La.Code Civ. Proc. art.1972(1). The judgment entered on December 2, 1993, was contrary to the law and evidence.
As to the claims for breach of contract and breach of implied covenant of good faith, we find that, as a matter of law, the individual shareholders cannot be held liable for these claims because the written contract was between Harmon and Mr. Barbe. The individual shareholders were not parties to that contract. Having reviewed all testimony and evidence, there is nothing that would support a finding of personal liability on the part of the individual shareholders, and, as explained above, the evidence does not support the existence of an oral contract with these individuals.
We find, therefore, that the trial court erred when it cast the individual shareholders in judgment in the termination suit, and when it denied defendants' motion for new trial.

CONCLUSION:
As to the stock redemption suit (Case # 90-3833), we vacate the amended judgment of January 31, 1994, and reinstate the judgment of December 2, 1993 awarding Mr. Barbe $299,623.50. We amend the December 2 judgment to provide for interest on this amount from the date that the sum was due in accordance with the stock redemption agreement, as provided by the joint stipulation, and remand this case to the trial court to set the attorney's fees as per the joint stipulation.
As to the termination suit (Case # 89-26356), we vacate the amended judgment of January 31, 1994, and reinstate the judgment of December 2, 1993. We reverse the December 2 judgment as to the finding that A.A. Harmon & Co. committed unlawful age discrimination against Joseph L. Barbe, Jr. We affirm the judgment as to the bad faith breach of contract by A.A. Harmon & Co. in connection with Mr. Barbe's employment contract. We reverse the December 2 judgment as to the liability of Terrell J. LeGlue, Glenn V. Weick, Mark R. Munson, Vincent J. Giardina, Kenneth M. Perret, Ellis J. Roussel, Jr. and David M. Bassemier. We amend the judgment to award $31,903.30 to Mr. Barbe as unpaid bonus owed him as a result of Harmon's breach of his employment contract, plus legal interest from October 31, 1989, on this amount for the bad faith breach of that contract.
Each party is to pay its own costs of appeal.
REVERSED IN PART; AMENDED AND AFFIRMED IN PART; AND REMANDED.
LOBRANO, J., concurs in part.
PLOTKIN, J., concurs in part and dissents in part, with written reasons.
WALTZER, J., concurs in part and dissents in part.
*1226 LOBRANO, Judge, concurring in part.
I concur in the majority result but write separately to express my view on the distinction of this case from Winston v. Bourgeois Bennett, Thokey & Hickey, 432 So.2d 936 (La.App. 4th Cir.1983). In Winston the liquidated damages were reasonable compensation for leaving the firm and taking some of its business. In this case, the liquidated damages are so egregious as to rise to the level of a non-competition agreement, which, in my opinion is prohibited by La. R.S. 23:921. Despite the somewhat general, although persuasive, argument of my dissenting colleague, the specifics of this case support the conclusion that Mr. Barbe was an employee of Harmon. Being a stockholder of his corporate employer does not destroy the employer-employee relationship required by the statute. The majority opinion notes well the fact that Harmon determined Mr. Barbe's salary, bonus and other employment conditions, including the terms of the employment contract. The contractual burden imposed on Mr. Barbe for competing against Harmon is tantamount to a covenant not to compete and not merely a liquidated damages clause.
PLOTKIN, Judge, concurring in part and dissenting in part, with written reasons.
Because I do not believe that the Louisiana Unfair Trade Practice and Consumer Protection Law (LUTPCL) applies to the facts of this case, I disagree with the majority's application of that the LUTPCL to the facts of this case. Accordingly, I concur in the majority's decision reversing the trial court judgment awarded Barbe recovery of damages allegedly caused by Harmon's filing of the reconventional demand.
More importantly, because I disagree with the majority's conclusion on the non-competition agreement issue, I respectfully dissent on that issue. Under the unique circumstances presented by this case, I would enforce the non-competition agreement contained in Barbe's employment contract and award liquidated damages as provided by the contract.

I. Application of LUTPL

The LUTPCL, LSA-R.S. 51:1401 et seq., was never intended to apply to fact situations like the one presented by the instant case, despite the fact that it applies specifically to "unfair trade practices." The portions of the law applicable to "unfair trade practices" are LSA-R.S. 51:1405 and LSA-R.S. 51:1409 (which allows a private action). LSA-R.S. 51:1405(A) states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." That portion of the statute is intended to apply to "any acts or practices which offend established public policy and are unethical, oppressive, unscrupulous, or substantially injurious to any person." Roustabouts, Inc. v. Hamer, 447 So.2d 543, 548 (La.App. 1st Cir. 1984). See also Strahan v. State, Department of Agriculture & Forestry, 93-0374 (La.App. 1st Cir. 8/25/94), 645 So.2d 1162, 1165, writ denied, 95-0040 (La.2/17/95), 650 So.2d 256; Coffey v. Peoples Mortgage & Loan, 408 So.2d 1153, 1156 (La.App.Cir. 1981).
Another court has held that a trade practice is "unfair" when it offends public policy and when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Camp, Dresser & McKee, Inc. v. Steimle & Asso., Inc., 94-547 (La.App. 5th Cir. 2/15/95), 652 So.2d 44, 48. The determination of whether something is an unfair trade practice is made on a case-by-case basis. Wyatt v. PO2, Inc., 26,675 (La.App.2d Cir. 3/1/95), 651 So.2d 359, 361, writ denied, 95-0822 (La.5/5/95), 654 So.2d 331.
A study of the jurisprudence applying the LUTPCPL does reveal several cases in which the act was applied to determine the validity of particular non-competition agreements. See First Page v. Network Paging Corp., 628 So.2d 130 (La.App. 4th Cir.1993), writ denied, 93-3193 (La.2/11/94), 634 So.2d 379; Morris v. Rental Tools, Inc., 435 So.2d 528 (La.App. 5th Cir.1983); National Oil Service v. Brown, 381 So.2d 1269 (La.App. 4th Cir.1980). However, all of those cases are factually distinguishable from the instant case.
*1227 In First Page, 628 So.2d 130, the trial court had found a violation of a non-competition agreement by three of six defendants, all of whom were former employees of the plaintiff employer. The trial court found a violation only on the part of those defendants who had signed the non-competition agreement; the court of appeal reversed, finding no violation of the LUTPCPA. However, the important factual point is that the case involved an employer and employees, not co-shareholders of a corporation, as in the instant case. Similarly, National Oil Service, 381 So.2d 1269, involved an employer and employee, not co-shareholders.
On the other hand, Morris, 435 So.2d 528, involved a business competitor who signed a non-competition agreement as a condition for acquiring stock in the defendant corporation; the corporation involved was not a professional corporation like the one involved in the instant case. The analysis in that case focused on whether the defendant committed an unfair trade practice against a competitor; the fact that the competitor owned stock was not part of the analysis.
In the absence of any jurisprudence to the contrary, which I was unable to find, I would hold that the trial court improperly applied the LUTPCPL to the facts of this case. Application of that law to this case has a chilling effect on professional corporations. The true purpose of the LUTPCPL is to protect consumers from being victimized in arms-length transactions. Harmon's filing of the reconventional demand in the instant case was an exercise of the company's legal right to seek the protection provided by the employment agreement between the members of the professional corporation. The exercise of legal rights should not give rise to a cause of action under the LUTPCPL because it would have a chilling effect on civil litigation. I would find that the trial court improperly applied the LUTPCPL to this case and reverse on that basis. Thus, I concur in the majority's result on this issue.

II. Enforcability of the non-competition agreement

In considering the enforcability of the non-competition agreement contained in Barbe's employment agreement with Harmon, both the majority and the concurrence fail to separate their consideration of the validity of the non-competition agreement itself from their analysis of the fairness of the liquidated damages portion of the provision. Finding that the liquidated damages are unduly onerous, both the majority and the concurrence hold that the non-competition agreement itself is invalid.
My study of the jurisprudence governing the validity of non-competition agreements containing liquidated damages provisions indicates that the analysis is significantly more complex than the majority or concurrence indicate. The basic question presented is whether the non-competition agreement contained in the employment agreement between Barbe and Harmon is prohibited by LSA-R.S. 23:921, which provides, in pertinent part, as follows:
No employer shall require or direct any employee to enter into any contract whereby the employee agrees not to engage in any competing business for himself, or as the employee of another, upon the termination of his contract of employment with such employer, and all such contracts, or provisions thereof containing such agreement shall be null and unenforceable in any court.
(Emphasis added.) As the majority quotes, the statute, as amended by the 1962 Louisiana legislature, contains a single exception to that rule "where the employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in"; under that limited circumstance, a non-competition agreement limited to two years is not prohibited. That exception does not apply to the instant case.
Because the exception does not apply, the question becomes whether the above general rule prohibits the particular non-competition agreement challenged in the instant case. The express terms of the statute indicate that it does not. First, as is discussed more fully below, Barbe was not just an "employee" of Harmon, but occupied an important management position. Second, the record in this case contains no evidence that Barbe *1228 was "required or directed" by Harmon to sign the non-competition agreement, at least not in the manner contemplated by the statute. The non-competition agreement in this case was a part of a comprehensive employment agreement which was agreed upon by all the members of the professional accounting corporation. Harmon "required or directed" Barbe to sign the agreement only to the extent that all the members of the corporation agreed on the terms of the agreement which governed their relationship and protected the business interests of the corporation. Thus, I would find that the non-competition agreement was not prohibited by the express terms of LSA-R.S. 23:921.
However, the fact is that Louisiana courts have sometimes applied LSA-R.S. 23:921 to partnership agreements and to agreements between members of corporations. The basic rule of Louisiana law governing application of the statute to such agreements was explained in Winston v. Bourgeois, Bennett, Thokey & Hickey, 432 So.2d 936 (La.App. 4th Cir.1983), cited by the other dissenting judge as controlling in the instant case. The Winston decision states as follows:
The right to control is one of the most important tests in determining whether one is truly an employee or an owner of a business. If the party is a partner and the partnership agreement applies equally to all partners and is fair, the [non-competition] agreement does not violate La. R.S. 23:921.
Thus, the Winston case indicates that the question of the reasonableness of the liquidated damages provision is not even relevant to the analysis of whether the non-competition agreement itself is valid. Instead, the Winston case indicates that the a two-part analysis should be applied to determine whether a non-competition provision in a partnership agreement or an agreement between members of a professional corporation may be enforced. First, the court should determine whether the non-competition agreement itself is valid. Only if the agreement itself is valid does the question of the reasonableness of the liquidated damages provision become relevant.

A. Validity of the non-competition agreement

As indicated above, LSA-R.S. 23:921 prohibits non-competition agreements only between employers/employees; however, under the jurisprudence, the prohibition has been extended to prohibit non-competition agreements arising out of "various relationships which are `essentially' employer/employee." Winston, 432 So.2d at 938. The Winston decision reviews a number of cases analyzing the application of LSA-R.S. 23:921 to partnerships and other types of business "associations," and concludes that LSA-R.S. 23:921 does not prohibit non-competition agreement between partners or other types of business associates where no employer/employee relationship exists.
The instant case involves a working shareholder in a professional corporation, who claims he is an employee, a situation specifically addressed in the Winston decision, which stated as follows:
In summary, to determine the application of LSA-R.S. 23:921, numerous factors must be considered. The basic premise underlying the prohibition stems from the fundamental right of individuals to seek success in our free-enterprise society. The concept is to protect those whose job position creates a disparity in bargaining power between the parties. The form of the contract is immaterial as is the label tacked to the individual: employee, associate, partner, independent contractor, or shareholder. Pertinent inquiry includes whether all concerned are bound equally to the covenant; whether the terms are fair to each party in all respects; the amount of control over the individual; if the person is subject to the wishes of a controlling majority; the circumstances under which the contract was executed; the effect on the individual's right to engage freely in his occupation after the association terminates.
Id. at 940 (emphasis added).
Moreover, other Louisiana cases which have considered the validity of non-competition agreements have considered right of control and the fact that the agreement applies equally to all members of the business *1229 organization as the most important factors. See Neeb-Kearney & Co. v. Rellstab, 593 So.2d 741 (La.App. 4th Cir.1992); Alexandria Anesthesia Service v. Firmin, 576 So.2d 1236 (La.App. 3d Cir.1991). In Alexandria Anesthesia Service, the court stated as follows:
With respect to partnership contracts, R.S. 23:921 as worded prior to its amendment has been held not to invalidate non-competition agreements which are supported by ample consideration, are confected between parties not possessing unequal bargaining strength, and are binding on all partners equally.
(Emphasis added.)
My review of the record, in light of the above factors, indicates that Barbe, like the plaintiff in Winston, "was not an employee in any sense of the word." Id. Barbe is an accountant, who was a shareholder, officer, and board member in a professional corporation composed entirely of accountants. When the business organization, which was a partnership when Barbe first became associated, elected to convert to the corporation form of business association, all members of the corporation signed the same employment contract, meaning that all members are equally bound by the non-competition agreement. Moreover, the evidence indicates that Barbe was not subject to the control of any of the other shareholders or subject to the wishes of a controlling majority, but instead that he exercised a great deal of the control himself, especially in relationship to the particular non-competition agreement at issue here. Moreover, again like the plaintiff in Winston, Barbe's vote was equal to the vote of his colleagues on all essential matters.
Moreover, although it is not analyzed this way in most of the Louisiana cases, the non-competition agreement at issue here passes the validity test imposed by courts around the country. That rule has been stated as follows:
In the absence of a controlling statute, it has been held that the enforceability of a covenant not to compete, ancillary to... the withdrawal of a partner from an accounting firm, depends upon a determination of whether the restriction is reasonably related to the legitimate business interests of ... the remaining partnership, and not unduly burdensome to the covenantor or the public.
Gulbis, Vitauts M., "Validity and Construction of Contractual Restriction on Right of Accountant to Practice, Incident to Sale of Practice or Withdrawal from Accountancy Partnership," 13 A.L.R.4th 661 (1981). See cases cited therein. That rule has been refined in the Restatement of Contracts (1932) as explained below:
The Restatement of Contracts (1932) provides, in §§ 513-516, that a bargain the performance of which would limit competition in any business or restrict the promisor in the exercise of a gainful occupation is illegal if the restraint is unreasonable. A restraint of trade is unreasonable generally if it is greater than is required for the protection of the person for whose benefit the restraint is imposed, imposes undue hardship on the person restricted, tends to create a monopoly, or to control prices or to limit production artificially, unreasonably restricts the alienation or use of anything that is the subject of property, or is based on a promise to refrain from competition and is not ancillary to an existent employment or contract of employment.
"Enforceability of Covenant against Competition in Accountant's Employment Contract," 15 A.L.R.4th 559 (1981).
In the instant case, the first two questions to be asked under the above analysis is whether the non-competition agreement "is reasonably related to the legitimate business interests" of the corporation and whether the agreement is no "greater than is required for the protection of the person for whose benefit the restraint is imposed"in this case, the corporation.
Applying either of the above rules, courts have routinely and traditionally enforced non-competition agreement between accountants where the restrictions are limited to dealings with clients of the former "employer." See Rhoads v. Clifton, Gunderson & Co., 89 Ill.App.3d 751, 44 Ill.Dec. 914, 411 N.E.2d 1380 (1980); Wolf & Co. v. Waldron, 51 Ill.App.3d 239, 9 Ill.Dec. 346, 366 N.E.2d *1230 603 (1977); Haynes v. Monson, 301 Minn. 327, 224 N.W.2d 482 (1974); Harvey v. White, 213 Cal.App.2d 275, 28 Cal.Rptr. 601 (3d Dist.1963); Ebbeskotte v. Tyler, 127 Ind. App. 433, 142 N.E.2d 905 (1957); Racine v. Bender, 141 Wash. 606, 252 P. 115 (1927).[15] In other cases, non-competition agreements contained in accountant's employment contracts have been enforced even though they were not limited to business relations of the former employer. Schultz v. Ingram, 38 N.C.App. 422, 248 S.E.2d 345 (1978); Faw, Casson & Co. v. Cranston, 375 A.2d 463 (Del.Ch.1977).[16]
Moreover, although the annotations cited above do discuss numerous cases in which a non-competition agreement incident of an accountant employment agreement was held to be invalid, all of those cases have important factual distinctions from the instant case. In virtually every one of those cases, the agreement in question was found to be unreasonable because of extended time periods or extended geographical areas, or because the restriction included clients whose relationships with the employer pre-dated or post-dated the accountant's tenure with the employer. None of those cases involved a non-competition agreement, entered at the time the employment began, limited to the clients of the former employer during the period when the employer was associated with the employer, limited in geographical area and time, like the agreement in this case.
Besides the fact that the above statutory and jurisprudential rules dictate that the non-competition agreement at issue in the instant case be enforced, the unique circumstances surrounding the instant case also require enforcement. The employment contract between Barbe and Harmon at issue was a voluntary agreement between the parties, intended to restrict the freedom of the various shareholders to change their employment precipitously. The reason for execution of the contract was to protect the corporation's investment in the professional development of the shareholders.
In this case, Harmon and Barbe engaged in a mutually-beneficial exchange. Barbe, who was a managing shareholder, wanted to insure that the other shareholders could not easily walk away for the CPA corporation after the firm had invested time, resources, and clients int heir careers. Thus, the parties entered into a co-investment agreement in an effort to protect the interests of the employer, Harmon. The non-competition agreement was designed to guarantee enforcement of the proper interests between the shareholders. Enforcement of the no-competition agreement is neither a restraint of trade nor an improper interference with the freedom of employment. Moreover, enforcement of the agreement acts as an important incentive for the shareholders to invest in future new shareholders because existing shareholders can be certain that the new shareholders will behave appropriately in relationship to the firm and to the firm's clients.
The contract of employment in this case is not subject to vitiated consent under La. C.C. art.1948 et seq. In fact, the contract in question was confected under Barbe's supervision; Barbe was the person with the superior bargaining power at the time the shareholders' agreement was signed. As the stronger party, he was responsible for most of the provisions in the contract; the weaker parties were Harmon and the other shareholders, who had little or no opportunity to negotiate the terms of the contract or to go elsewhere for a more favorable contract. For this reason alone, the employment contract should be fully enforced.
Additionally, as a general rule, the contract provision should be enforced because of the reasonable expectations of the parties. Obviously, agreements between accountants and other similarly-situated professionals are customary. Again, the policy reason for this practice is to protect the firm's investment in the shareholders and to provide an incentive for the shareholders to act with good faith and fair dealing with one another.
Thus, the non-competition agreement contested in the instant case is enforceable. Barbe agreed, along with all the other members *1231 of the professional corporation, to be restricted from providing accountant services to Harmon's clients for a two-year period after separation from the corporation. The terms of the agreement are not unreasonable and are reasonably related to protection of Harmon's business interests. Moreover, Barbe was an integral part of the development of the agreement. I would hold that the non-competition agreement itself is unenforceable.

Reasonableness of the liquidated damages provision
I believe that the question of the reasonableness of the liquidated damages provision should be considered separate and apart from the question of the validity of the non-competition agreement. The agreement at issue in the instant case provided that any former Harmon employee who violated the non-competition agreement was obligated to pay liquidated damages equal to the greater of 200 percent of the fee Harmon charged that client during the former year or 200 percent of the fee charged by the employee during a one-year period.
No Louisiana cases address the validity of such a liquidated damages provision contained in a non-competition agreement which is part of an employment contract. However, a study of cases from other jurisdictions indicates that such provisions are not uncommon. Such liquidated damages provisions were upheld in the following cases: Peat, Marwick, Main & Co. v. Haass, 818 S.W.2d 381 (Tex.1991) [liquidated damages as part of merger agreement of "all direct costs (out-of-pocket expense), paid or to be paid by [merged firm] in connection with the acquisition of such client including, without limitation, retirement benefit obligations of any predecessor firm];" Holloway v. Faw, Casson & Co., 78 Md.App. 205, 552 A.2d 1311 (1989) [liquidated damages equal to 100 percent of fees paid by client to partnership in last year client was served by partnership]; Dobbins, DeGuire & Tucker, P.C. v. Rutherford, MacDonald & Olson, 218 Mont. 392, 708 P.2d 577 (1985) [liquidated damages of 100 percent of fees collected from clients of employer within 12 months after termination of employment, to be paid in monthly installments, with interest].
However, such liquidated damages provisions were invalidated in the following cases: Cherry, Bekaert & Holland v. Brown, 582 So.2d 502 (Ala.1991) [liquidated damages of 100 percent of most recent year's fees charged by employer to client was invalid attempt to circumvent state statutory ban on covenants not to compete]; Smith, Batchelder & Rugg v. Foster, 119 N.H. 679, 406 A.2d 1310 (1979) (liquidated damages of 50 percent of fees received from serving former clients were unreasonable because of the size of the geographical area covered); Cherry, Bekaert & Holland v. LaSalle, 413 So.2d 436 (Fla. App.3d Dist.1982) [liquidated damages of 200 percent in clause which restricted former employee for three years invalid because the agreement did not define the geographical area, and did not restrict the time when the clients had a business relationship with the former employer].
Once again, the relevant jurisprudence indicates that even liquidated damages provisions in non-competition agreements should be enforced unless accompanied by unreasonable geographical restrictions, or provisions which otherwise violate pertinent state law. Of special interest is the LaSalle case, which, which also involved a 200 percent liquidated damages provision; however, that agreement also restricted the employee's conduct for three years, and did not limit the agreement to a defined geographical area. The court held that the agreement was an unreasonable restraint of trade, that it was based on inadequate consideration, and that it imposed an excessive penalty.
I would distinguish the instant case from LaSalle. In the instant case, the employee has not complained about the duration of the restrictions or about the definition of either geographic area or the clients covered. The fact that the agreement was non-specific concerning these necessary elements was an important part of the analysis in LaSalle. The majority opinion in the LaSalle case does not even discuss whether the 200 percent liquidated damages figure is unreasonable.
In light of the above discussion, I would hold that the liquidated damages agreement *1232 in the instant case is enforceable. This particular agreement is not grossly out of line with other agreements which have been upheld. Moreover, I see Barbe's intimate involvement with the confection of the non-competition agreement in the instant case, which is not even mentioned by the majority or concurrence, as very important to the analysis of this case. The record indicates that Barbe exerted a great deal of power in the accounting corporation, and that it was, in fact, he that insisted on the inclusion in the employment contract of the exact non-competition agreement and liquidated damages provision of which he now complains. I believe that contractual provisions should be viewed as the law between the parties in the absence of some compelling reason for an exception to that general rule. Barbe apparently felt that the liquidated damages provision was necessary either to protect Harmon's business interests or to control other members of the corporation. The majority and concurrence make a serious mistake in allowing Barbe to escape the consequences of his own actions in this regard.
Moreover, even if the majority and concurrence are correct in finding that the liquidated damages provision is unreasonably onerous, I disagree with their decision to invalidate the non-competition agreement completely. A study of the jurisprudence and other materials indicates that this court has the authority to reform to the liquidated damages provision and enforce the agreement to the extent it would be reasonable. See Tinio, Ferdinand S. Tinio, L.L.B., L.L.M., "Enforceability, Insofar as Restrictions Would be Reasonable, of Contract Containing Unreasonable Restrictions on Competition," 61 A.L.R.3d 397 (1975). Given the fact that this case involves a contract between parties of equal bargaining power, I believe that the liquidated damages provision should have been reformed, if necessary, to allow enforcement of the non-competition agreement.
Accordingly, I would reverse the trial court judgment on this issue, uphold the non-competition agreement, and award damages to Harmon as provided by the liquidated damages provision. Thus, I dissent on this issue.
WALTZER, Judge, concurring in part and dissenting in part.
I agree with the majority opinion in all respects except its action recognizing Mr. Barbe's claim that the liquidated damages provision of the contract he prepared constitutes an invalid non-compete agreement under La.R.S. 23:921.
The economic realities of this case dictate that the outcome is controlled by this Court's decision in Winston v. Bourgeois, Bennett, Thokey and Hickey, 432 So.2d 936 (La.App. 4th Cir.1983). I find it to be very persuasive authority for holding Mr. Barbe liable for liquidated damages arising from his CPA activities after he left Harmon. In Winston, plaintiff was a partner in Bourgeois, Bennett, Thokey & Hickey, a firm of CPAs. All parties to the partnership agreement were bound by language providing a formula for compensation of the firm for business done by a departing partner. This Court, per curiam, enforced the provision, holding:
In summary, to determine the application of La. R.S. 23:921 [statute regulating non-competitive provisions], numerous factors must be considered. The basic premise underlying the prohibition stems from the fundamental right of individuals to seek success in our free-enterprise society. The concept is to protect those whose job position creates a disparity in bargaining power between the parties. 432 So.2d at 940.
The Winston court also found that Mr. Winston
was not an employee in any sense of the word. His vote was equal to his colleagues on essential matters. There is no evidence or indication that the firm exercised any control or direction over Winston's work.... [The reimbursement for competitive activity provision] by its own terms applies equally to all partners.... There was no disparity in bargaining power between [sic] the partners.... Winston was not estopped from pursuing his career nor was he prohibited from pirating his firm's clients. He was free to do what he didleave BBTH and take along some of the business, but he was obligated to compensate his former partners for a reasonable period of time and for a predictable *1233 sum. His commitment to Article II [the reimbursement provision] was not extracted through any disparity in his bargaining power. Considering all of the above, we find LSA-R.S. 23:921 is not applicable....
Mr. Barbe was in an even stronger control position than was Mr. Winston. Mr. Barbe was the controlling shareholder; the evidence indicates that he required all Harmon's CPAs to sign contracts containing the liquidated damages provision. Having created this "sword," Mr. Barbe must live or die by it. As the majority points out, Mr. Barbe's attitude towards his partners was, "my way or no way," with respect to liquidated damages upon leaving employment as with other matters of firm management.
Under the rationale in Winston, the benefits of the anti-competition statute are not applicable to Mr. Barbe. Because I believe Winston is directly on point, I believe the matter should be submitted to this Court en banc to determine whether it is this Court's decision to overrule Winston.
NOTES
[1] The individual shareholders named as defendants in both actions are: Terrell J. LeGlue, Glenn V. Weick, Mark R. Munson, Vincent J. Giardina, Kenneth M. Perret, Ellis J. Roussel, Jr., David M. Bassemier.
[2] The spouses named are: Sandra A. LeBlanc LeGlue, Susan G. Weick, Virginia C. Munson, Donna L. Giardina, Myra C. Perret, Barbara M. Roussel, Kathleen G. Bassemier.
[3] McGrath was deceased at the time of trial. He is referred to in briefs and testimony as a "phantom" stockholder because he was not a licensed public accountant, and therefore could not own stock in a professional accounting corporation.
[4] Each existing shareholder would sell a portion of his stock to an incoming shareholder.
[5] By law, only duly licensed accountants can form professional accounting corporations, and own shares of stock therein. La.Rev.Stat. 12:1012 and 12:1015. Harmon, however, employed accountants who were not state licensed and, therefore, were not eligible to be shareholders. These accountants also executed employment agreements with Harmon.
[6] In 1986, an updating agreement was executed by the shareholders whereby the mandatory retirement age was changed from age 70 to age 65.
[7] The entire package offered to Mr. Barbe totalled $631,000.00.
[8] The building in which Harmon leased space was owned by A.A.H. & Co. Realty, a partnership that included some of the Harmon shareholders. The defendant shareholders wanted Mr. Barbe to agree to vote affirmatively to amend the articles of partnership of A.A.H. & Co. Realty to provide that 1) termination of employment from Harmon would not cause the interest of any partner to be purchased or sold; 2) that it would not be a necessity for a partner of A.A.H. & Co. Realty to be a shareholder of Harmon; and 3) that a partnership meeting would be held within six months to determine the feasibility of the continued ownership of the building.
[9] This meeting apparently was scheduled in response to a request by Mr. Barbe's attorney in a letter dated August 25, 1989.
[10] The contract also provided that the employee had the right to terminate his employment at any time, after giving thirty days written notice, if his monthly salary was decreased during any renewal term to less than the monthly salary paid him in the previous year.
[11] The letter advised Mr. Barbe that he would continue to receive his monthly salary of $8,333.33 through October 31 and be entitled to receive his pro rata share of shareholder profit participation bonuses for the fiscal year ended October 31, 1989; continue to receive his monthly auto allowance of $425 through October 31, but not reimbursement of auto insurance premiums, repairs, maintenance and gasoline during this period. The corporation also would continue to pay his medical insurance premiums, dependent care coverage, professional licenses and group life insurance premiums through October 31.
[12] Interest will run from October 31, 1989, the date upon which his bonus became due.
[13] Because this contract was executed in 1980, the 1962 amendment which provides an exception to the prohibition in those instances where the "employer incurs an expense in the training of the employee or incurs an expense in the advertisement of the business that the employer is engaged in, then in that event it shall be permissible for the employer and employee to enter into a voluntary contract and agreement whereby the employee is permitted to agree to bind himself that at the termination of his or her employment that said employee will not enter into the same business that employer is engaged in ... for a period of two years." La.Rev.Stat. 23:921. Harmon has not alleged nor offered any evidence that it incurred expense in training Mr. Barbe and advertising its business.
[14] The stipulation at issue related to how interest would be calculated on the amount owed Mr. Barbe for his shares of Harmon stock. It did not address interest in the termination suit.
[15] All cases discussed in annotations cited above.
[16] Cases discussed in annotations cited above.